[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14069

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-21315-CV-CMA

SEA BYTE INC.,

Plaintiff,

HUDSON MARINE MANAGEMENT
SERVICES, INC.,

Plaintiff-Appellant
Cross-Appellee,

versus

HUDSON MARINE MANAGEMENT
SERVICES, INC.,

Defendant,

THOMAS MILLER (MIAMI), INC.,
THOMAS MILLER P&I LTD.,

Defendants-Appellees
Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 20, 2009)

Before BARKETT and FAY, Circuit Judges, and TRAGER,[*] District Judge.

FAY, Circuit Judge:

This case arises out of a fixed-price contract between Appellant Hudson Marine Management Services, Inc. ("Hudson") and Appellee Thomas Miller ("Miller") in which Miller hired Hudson to restore a damaged underwater reef. Before Hudson could complete the restoration, the area experienced a series of hurricanes which expanded the scope of the project. Hudson never finished the job, and Hudson and Miller each filed claims against each other. The district court held that neither party breached their contract, but rather the contract terminated by its own terms when the hurricanes struck. The court declined to award any contractual damages, but awarded Hudson damages based on quantum meruit for work it performed after the contract terminated.

Hudson appealed the court's determination that Miller did not breach the contract, as well as the court's calculation of damages. Miller cross-appealed, also

[*] Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

2

disputing the court's calculation of damages. After review and oral argument, we affirm in part and reverse in part.

## I. FACTS

### A. Background

On March 26, 2004 the vessel M/V Eastwind ("Eastwind") ran aground on an underwater coral reef in the Atlantic Ocean just off the Fort Lauderdale coast. According to Florida law when a ship runs aground on a reef in Florida's waters, the ship's owner must arrange for a damage assessment survey, reattach live coral heads (in a process known as "triage"), and repair damage to the site. These tasks are completed with oversight from state and county officials known as "Trustees."

The Eastwind is owned by Eastwind Special Maritime Enterprise, which is a member of the United Kingdom Mutual Steam Ship Assurance Association ("the UK Club"). The UK Club is a mutual insurance association comprised of vessel owners, and Miller is its manager.[1] Miller contracted with Hudson, a "marine environmental casualty management corporation," to restore the grounding site. Specifically, Miller and Hudson entered into a "Time and Materials" contract for a

---

[1] Thomas Miller P&I Ltd. is a United Kingdom corporation and the London representative of Thomas Miller (Bermuda) Ltd., which is the manager of the UK Club. Thomas Miller (Miami) Inc. is a Florida corporation and the local representative of Thomas Miller P&I Ltd. Thomas Miller P&I Ltd. and Thomas Miller (Miami) Inc. are the Appellees/Cross-Appellants here, and are jointly referred to as "Miller."

3

damage assessment survey, reef restoration, and rubble stabilization or removal. Hudson was to be compensated on a time and materials basis at the rates specified in Hudson's rate sheet; reimbursed for travel, living and other expenses at cost plus 15%; and reimbursed for divers' per diem at an agreed rate.

Hudson subcontracted with marine biologist Jeffrey Waxman and Sea Byte, Inc. ("Sea Byte") to assess the grounding site, confer with the Trustees, and restore the reef. Sea Byte began work in April 2004.[2] Thereafter Miller grew concerned about the high cost of the project under the Time and Materials contract, and in July 2004 the parties began renegotiating. On July 25, 2004 they agreed to modify their previous contract to a "Lump Sum" contract for a total price of $5,200,000, which included $1,798,000 Miller had already paid to Hudson. The $5,200,000 was intended to cover the entire scope of the project.

The Lump Sum contract was actually composed of a variety of email statements and telephone conversations. The email exchanges negotiating the Lump Sum contract in July 2004 reflect that the parties agreed Miller would make "regular" and/or "installment" payments. Whereas Miller preferred payments linked to progress, Hudson initially preferred payments linked to specific dates. It

---

[2] The plan was to remove all underwater rubble at the grounding site that was one inch or larger by placing it in metal baskets, raising the baskets with inflated bags, towing the baskets to an off-shore dumping site for the rubble to be stacked and eventually hauled away, and bringing the empty baskets back to the site.

4

appears that while the parties later agreed that Miller's payments pursuant to the Lump Sum contract were to be linked to actual progress milestones, such as the removal of certain amounts of rubble, they never reached an agreement as to which ones. Nevertheless, Miller made a series of payments to Hudson between July 25, 2004 and the end of August 2004 totaling $900,000.[3]

The Lump Sum contract also contained a "severe weather" provision as articulated in a July 25, 2004 email from Ms. Hudson, Hudson's representative, which stated: "Effects to Reef from severe weather conditions: . . . Should changes occur due to severe weather, the Club, ourselves, and the Trustees would then need to readdress the scope of the project." In the same email Ms. Hudson agreed to Miller's offer of $5,200,000 "to complete the reef restoration and rubble removal project within the present, understood and agreed scope of work."

Beginning in early September the area experienced a series of hurricanes which further damaged the reef, including Hurricane Frances on September 2 and Hurricane Jeanne on September 25. Hudson contended that the hurricanes increased the scope of the work - apparently, the hurricanes scattered the stacks of

---

[3] Miller paid Hudson by transferring sums into an escrow account held by Hudson, from which Hudson drew funds as Miller approved its invoices. Miller transferred payments of $450,000 each to the escrow account on July 16, July 21, and August 18. Hudson received payment from the escrow account in the following amounts: $240,000 on July 30, $210,000 on August 17, and $450,000 on August 20.

rubble that Sea Byte's divers made both underwater and on dry land. Hudson requested an additional $2,100,000 to complete the project. The parties attempted to negotiate a new price, but were ultimately unable to reach an agreement. Hudson did some work after hurricanes, but on October 26, 2004 informed the Trustees it was ceasing operations as of October 29, 2004. Miller ultimately hired another entity (Marine Resources Inc., or "MRI") to complete the restoration project for $1,357,921.

## B. Procedure

On October 26, 2005 Hudson filed suit in New Jersey district court against Miller for non-payment, and the case was later transferred to the Southern District of Florida. Hudson's complaint included four claims. The first three claims were for breach of the Time and Materials contract, unjust enrichment, and quantum meruit, all seeking the same relief: payment of $1,870,000 allegedly owed under the Time and Materials contract. The fourth claim sought a declaratory judgment to determine the amount Hudson owed to Sea Byte if Hudson did not recover the full amount of damages from Miller. Miller counterclaimed and alleged it overpaid Hudson for faulty and/or incomplete work, seeking at least $500,000 in damages. Sea Byte filed a separate lawsuit against Hudson in Florida state court for non-payment, which was removed to the Southern District of Florida and

6

consolidated with Hudson's suit against Miller.  Following a mediation involving

Hudson, Miller, and Sea Byte, Sea Byte received $750,000 from Miller and

$100,000 from Hudson.  Thereafter Sea Byte dismissed its claims against Hudson.

Trial on Hudson's and Miller's claims began on September 17, 2007.  On

September 20, 2007 the court held that Miller breached the Lump Sum contract by

failing to make regular payments to Hudson as required, causing Hudson to

experience a cash shortage and walk off the job on October 29, 2004.[4]  However,

the court reversed itself after reviewing the parties' evidence and post-trial

submissions, holding that neither party breached the Lump Sum contract because

the hurricanes triggered a provision allowing the contract to expire on its own.  See

Order, D.E. #99 at 13.[5]

The court also found that Hudson performed quasi-contract work after the

Lump Sum contract expired, and was thus entitled to recover in quantum meruit for

the reasonable value of this work.  The court examined the rates Sea Byte charged

and used them as a guide to award Hudson $229,427 for the work it performed

between September 2 and October 29 (or "post-hurricane" work).  The court also

held that Miller was entitled to a credit for the $750,000 it paid to Sea Byte

---

[4]  As of that date, Hudson had been paid a total of $2,698,000.

[5]  Miller submitted a post-trial memorandum asking the court to revise its initial conclusion that Miller breached the Lump Sum contract.  See D.E. #85.  Hudson's response is at D.E. #91.

following mediation.

Hudson appealed, disputing the court's determination that Miller did not breach the Lump Sum contract.[6] Hudson also disputes the court's calculation of damages for Hudson's work both before and after the hurricanes, and court's award of the $750,000 credit to Miller. Miller cross-appealed, arguing that the court erred in calculating the value of work Hudson performed prior to September 2 (or "pre-hurricane" work).

## II. DISCUSSION

### A. Standard of Review

"We review a district court's factual findings when sitting without a jury in admiralty under the clearly erroneous standard. We review the district court's conclusions of law de novo." Venus Lines Agency, Inc. v. CVG Int'l Am., Inc., 234 F.3d 1225, 1228 (11th Cir. 2000). "A finding of fact is clearly erroneous when the entirety of the evidence leads the reviewing court to a definite and firm conviction that a mistake has been committed." Dresdner Bank AG v. M/V Olympia Voyager, 446 F.3d 1377, 1380 (11th Cir. 2006).

Where a case arises in admiralty, we apply the general maritime law. See, e.g., Coastal Fuels Mktg., Inc. v. Fla. Express Shipping Co., Inc., 207 F.3d 1247,

---

[6] At trial Hudson argued that the parties never entered into a valid Lump Sum contract. On appeal Hudson does not dispute the court's finding that the parties did enter into the contract.

8

1250 (11th Cir. 2000). General maritime law is federal law. Id. at 1251. However, "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." Id.

**B. Analysis**

*1. Termination of the Lump Sum Contract*

As stated above, the "severe weather" provision of the Lump Sum contract provided: "Effects to Reef from severe weather conditions: . . . Should changes occur due to severe weather, the Club, ourselves, and the Trustees would then need to readdress the scope of the project." The district court found that the Lump Sum contract expired by its own terms because the hurricanes triggered its severe weather provision. Specifically, the court held the Lump Sum contract terminated when the hurricanes increased the work required to restore the reef, Hudson requested more money, and the parties were unable to negotiate a new deal. We affirm on this point.

In support of its ruling, the court found that Hudson invoked the Lump Sum contract's severe weather provision and requested an additional $2,100,000 to complete the project. The court found that Hudson effectively stopped its

9

restoration work after the hurricanes struck, and eventually left the job site because the parties could not come to a new agreement. The court examined Hudson's progress reports and concluded that virtually no work was performed from September 1 to October 10 except when divers inspected the effects of the hurricane on the grounding site. The court further found that on September 20 and between October 10 and October 27 workers re-stacked the rubble strewn by the hurricanes, but did not perform any actual restoration work.

These findings are not clearly erroneous and are supported by the record. It is plain that under the Lump Sum contract, Miller agreed to pay Hudson $5,200,000 "within the present, understood and agreed scope of work." It is also plain that after the hurricanes struck, Hudson requested an additional $2,100,000 to complete the project. Indeed, according to Ms. Hudson's trial testimony, Hudson sought additional money to complete the job after the hurricanes struck because "the job was not able to be completed because the job was no longer as it had been." Sept. 17 Trial Tr. at 201. Ms. Hudson confirmed that Hudson requested $2,100,000 in additional funds because Hudson believed "the job site had been changed by the hurricane and that there needed to be additional monies set aside for the payment of Hudson's work due to the hurricane." Id.

It is also plain that after the hurricanes struck, Hudson did stop its restoration

10

work. The parties stipulated that "[f]rom August 4 through 31, all three [of Sea Byte's dive teams] were engaged in collecting and stacking rubble, except for some occasions when some of the divers were moving boat anchors and drilling holes for and placing rods to mark reattached coral heads." D.E. #63 at 11. Hudson received payment during this time on August 17 for $210,000 and on August 20 for $450,000. After the hurricanes struck in early September, Hudson stopped restoration work and Miller stopped making payments into Hudson's escrow account. Indeed, the parties stipulated that "[n]o work was done on the grounding site during September except for surveys of the hurricane effects on September 7, 9, 17, 19, 29, and 30, and clean up of rubble on September 20." Id. at 12. From October 10 through October 27 "[t]wo teams of Sea Byte's divers restacked rubble." Id. During this time, the parties were attempting to reach a new agreement with a new price.

Further, as the court noted, when Hudson informed the Trustees it was stopping restoration work as of October 29, 2004, it stated this was because of Miller's failure "to pay [] invoices" as well as the parties' "inability to reach an agreement . . . for payment for the clean up and removal of the rubble created by the grounding which was scattered by Hurricane Frances . . . ." See O. at 15; Initial Br. at 14.

11

Based on these facts, we do not believe the court committed clear error in finding that Hudson invoked the Lump Sum contract's severe weather provision, that the parties tried to reach a new agreement but were unable to, and that the contract terminated without either party being in breach. Hudson argues that the real reason it stopped working was not severe weather but rather the lack of "regular" payments from Miller, as required by the Lump Sum contract. However, while Hudson points to testimony by Ms. Hudson stating this was the case, Hudson has still failed to show that the court's findings to the contrary were "clearly erroneous" such that the "entirety of the evidence" leads us to a "definite and firm conviction that a mistake has been committed." Dresdner Bank, 446 F.3d at 1380.[7]

In sum, we affirm the court's findings that Hudson invoked the Lump Sum contract's severe weather provision when the hurricanes expanded the scope of the project, that the parties were unable to reach a new agreement, and that the contract was thus terminated by its own terms.

2. *Hudson's Pre-Hurricane Work*

Having determined that the court properly found the Lump Sum contract

___

[7] In support of its argument that the contract did not terminate on account of the hurricanes, Hudson states:"[w]hen severe weather occurred on September 2, 2004, the parties did not just walk away from each other; rather, Hudson continued to work on the site and [Miller] continued to accept that work." Initial Br. at 38. However, it is clear that Hudson was not performing *restoration* work after that date, but rather work necessitated by the hurricanes which the parties agree was outside the scope of, and not contemplated by, the Lump Sum contract. Thus, this argument is unavailing.

terminated on September 2, we must now determine whether the court correctly calculated Hudson's damages for work it performed under the contract up to that date. "We review the district court's determination of the proper legal standard to compute damages de novo. The court's factual findings, however, will only be reversed if clearly erroneous." A.A. Profiles, Inc. v. City of Fort Lauderdale, 253 F.3d 576, 581 (11th Cir. 2001) (citation omitted).

The court held that Hudson was entitled to the full amount of payments received between when the Lump Sum contract came into effect, July 25, and the start of the hurricanes, September 2. This amount is $900,000. In reaching this conclusion the court focused on the fact that a valid contract existed between those dates. O. at 25. Since that contract did not include a *provision* for reassessing the value of past work in the event of termination because of severe weather, the court declined to create one. Id.

Both parties claim the court used the wrong method to calculate damages for Hudson's pre-hurricane work. Hudson claims it should have recovered the total value of the Lump Sum contract ($5,200,000) minus what Miller later paid to MRI to complete the restoration project ($1,357,921) and minus what Miller has already paid to Hudson ($2,698,000). This leaves $1,144,079.

Miller claims, in its cross-appeal, that the court should have evaluated the

13

pre-hurricane work Hudson actually did on a quantum meruit basis. Miller seeks a refund of the portion of the $900,000 that does not correspond to the reasonable value of Hudson's pre-hurricane work. According to Miller, the reasonable value of Hudson's work between July 25 and September 2 is $513,417.50. This amount is the cost of the work Sea Byte and Waxman actually performed for Hudson during that time as reflected in their invoices, plus an industry-standard 15% mark-up. Thus, according to Miller, it is entitled to $900,000 minus $513,417.50, or $386,582.50.

We agree with the district court that quantum meruit damages are not available here. In holding it could not award quantum meruit damages, the court cited to several Florida federal and state cases.[8] See, e.g., Webster v. Royal Caribbean Cruises, Ltd., 124 F. Supp. 2d 1317, 1326 (S.D. Fla. 2000) ("[R]ecent Florida appellate decisions have reinforced the position that quantum meruit damages cannot be awarded when an enforceable contract exists."). Indeed, Florida courts do hold that "[q]uantum meruit relief is founded upon the legal fiction of an implied contract. This fiction cannot be maintained, however, when the rights of the parties are described in a written contract." Corn v. Greco, 694 So. 2d 833, 834-35 (Fla. 2d DCA 1997); see also Cross v. Strader Const. Corp.,

_____

[8] Based up on our review of the case law, we do not believe federal admiralty law provides a rule on this - thus, we will look to Florida law. See Coastal Fuels, 207 F.3d at 1250.

14

768 So. 2d 465, 466 (Fla. 2d DCA 2000) ("Quantum meruit is the antithesis of matters contracted for. Quantum meruit damages cannot be awarded when an enforceable contract exists."); Harding Realty, Inc. v. Turnberry Towers Corp., 436 So. 2d 983, 984-985 (Fla. 3d DCA 1983) ("[T]he law will not imply a contract where a valid express contract exists."); Solutec Corp. v. Young & Lawrence Assocs., Inc., 243 So. 2d 605, 606 (Fla. 4th DCA 1971) ("Any proof of an express agreement between the parties as to the compensation to be paid for the services rendered would defeat rather than sustain an action based upon quantum meruit . . . ."). The parties had enforceable contracts at all times prior to September 2. The original contract was superceded by the novation entered into on July 25. This contract expired in a manner clearly contemplated by the terms of the contract and through no fault of either party. We will not use a theory of implied contracts to award damages under these circumstances.[9]

Although we agree with the district court's rejection of quantum meruit damages, we do not agree with its ultimate approach. The court held it could not reevaluate the $900,000 in payments Miller made to Hudson because they were

---

[9] Both Hudson and Miller invoke Section 377 of the Restatement (Second) of Contracts to argue for restitution damages. However, the situations listed in Section 377 - impracticable performance or frustration of purpose, non-occurrence of a condition, or disclaimer by a beneficiary - do not apply here. In those situations, an unexpected event arises to foil a contract. Here, in contrast, the parties were governed by a valid Lump Sum contract which *explicitly* contemplated the occurrence of severe weather, and provided that in such event the parties must renegotiate.

15

made pursuant to a valid contract. However, this ignores the fact that the parties' contract affixed a total value to the restoration project: $5,200,000. In our view, there is only one fair and logical way to give effect to that agreement: to determine what percentage of the project's value Hudson provided under the contract as of September 2, and multiply that percentage by the contract price of $5,200,000. This will tell us whether, considering the $2,698,000 Miller already remitted, Hudson has been overpaid or underpaid.

We were unable to find a case taking this approach under admiralty law or Florida law. However, we did find a case from a Michigan appellate court that provides some guidance. In Plunkett & Cooney, P.C. v. Capitol Bancorp Ltd., the court addressed the question of "[a]n attorney's right to compensation under a fixed-fee agreement where the attorney is prematurely terminated." 536 N.W.2d 886, 889 (Mich. App. 1995). The Plunkett court acknowledged the client's right to terminate his attorney at any time, and also the client's obligation to pay for the attorney's services. Id. The court noted that "[w]here a fixed-fee agreement exists, the value of the services that the attorney has agreed to render has been established." Id. Thus, the court held, the value of the attorney's services prior to the discharge "constitutes the percentage of the services that have been completed pursuant to the contract, multiplied by the contract price." Id.

16

We find the approach taken in <u>Plunkett</u> instructive. <u>Id.</u>; <u>see also</u>

RESTATEMENT (SECOND) CONTRACTS § 204 (1981) ("When the parties to a bargain

sufficiently defined to be a contract have not agreed with respect to a term which is

essential to a determination of their rights and duties, a term which is reasonable in

the circumstances is supplied by the court."). In this case, as in <u>Plunkett</u>, the

parties agreed on the total value of a project, and one party performed some work

before the contract terminated without either party's fault. We generally agree that

the best way to assess damages in such a situation is to multiply the total value of

the project (as set by the parties) by the percentage of the project completed.[10]

Here, however, the circumstances require a slightly different approach. It is

fairly simple to measure what percentage of a contract has been completed when

the unit of value is an attorney's time, as in <u>Plunkett</u>. It is not so simple to measure

the percentage of completion in the instant case, where different aspects of the

---

[10] We have found cases demonstrating that parties to a contract sometimes provide for this remedy in the event of termination. <u>See, e.g.</u>, <u>Ervin Constr. Co. v. Van Orden</u>, 874 P.2d 506, 508 (Idaho 1993) (in a fixed-fee contract to finish the construction of a home, the parties provided that the owners "could terminate the contract at any time by paying [the contractor] the percentage of work completed based on the net contract amount and the value of materials installed"); <u>Roof Sys., Inc. v. Johns Manville Corp.</u>, 130 S.W.3d 430, 442 (Tex. App. 2004) (contract's "termination for convenience clause" provided that one party could terminate the contract for convenience by paying the other party "its share of the contract amount proportionate to the percentage of its work completed and other reasonable cancellation costs incurred as a result of said termination."); <u>Cloud Cartographics, Inc. v. Elert</u>, No. C0-94-1577, 1995 WL 130626, at *1 (Minn. App. 1995) (contracts provided that either party could terminate, and upon termination one party "would be entitled to a percentage of each contract price equal to the percentage of work completed under each contract").

17

restoration project, such as reattaching live coral and collecting rubble, may have required different kinds of labor, equipment, and skills. For this reason, the court should determine what percentage of the project's *value* Hudson completed as compared to the value of the total project.

In sum, the district court must make a factual finding as to what percentage of the project's value Hudson provided under the contract,[11] and multiply this percentage by the total contract price of $5,200,000. Then the court may determine whether, considering all payments Miller made to Hudson for the project, Miller underpaid Hudson (in which case Hudson is entitled to damages from Miller) or Miller overpaid Hudson (in which case Miller is entitled to damages from Hudson). Thus, we reverse the district court's ruling as to the value of Hudson's pre-hurricane work, and remand for findings consistent with this opinion.

*3. Hudson's Post-Hurricane Work*

We must also review the district court's award of damages for Hudson's post-hurricane work. As stated above, while we review the court's determination of the proper legal standard to compute damages de novo, we review the court's factual findings for clear error. See A.A. Profiles, 253 F.3d at 581.

---

[11] In making this determination, the court should assess to what extent Hudson completed the project *as originally planned* - see Footnote 2. Although Miller now complains that Hudson's original plan was inefficient, this is the plan for which it agreed to pay $5,200,000 and we cannot save Miller from the bargain now.

The court held Hudson was entitled to $229,427 in quantum meruit for the work it performed between September 2 and October 29, because no enforceable contract existed during that period. The court arrived at that sum by examining the value of the work performed by subcontractors Sea Byte and Waxman and adding a 15% mark-up. Miller's expert testified that 15% was the industry standard for marking up subcontractors' charges, and a 15% mark-up was also consistent with Sea Byte's and MRI's own practices.

The parties do not dispute the court's determination of the proper legal standard for Hudson's recovery. Indeed, the parties agree that Hudson should recover in quantum meruit for any work necessitated by the hurricanes, such as restacking piles of rubble, because such work was outside the scope of the Lump Sum contract.[12] Where the parties disagree is on whether the district court properly assigned a reasonable value to Hudson's work. Hudson contends that by the time it ceased operations, it had restored the grounding site to its pre-hurricane condition. It argues that Miller's trial expert William Precht testified that the hurricanes caused at least $734,000 worth of damage, and thus the proper value of its hurricane work is at least $734,000.

---

[12] "When recovery is had on quantum meruit basis, the measure of recovery is not the value to the defendant, but where it involves labor performed and materials furnished, it is to be determined by the reasonable value of the labor performed and the market value of the materials furnished . . . ." Moore v. Spanish River Land Co., 159 So. 673, 674 (Fla. 1935).

We affirm the district court on this point. In order to find the "reasonable value" of Hudson's post-hurricane work, the court examined the cost of the actual work Hudson's subcontractors performed and added a 15% mark-up to account for Hudson's margin. Testimony supported the fact that a 15% mark-up is customary in the industry, and Hudson did not produce any evidence to the contrary. While Hudson may prefer that we use its calculation of the value of its post-hurricane work, it has not convinced us that the court's own calculation was clearly erroneous. Because we are not left with "a definite and firm conviction that a mistake has been committed" on this point, we will not disturb the court's post-hurricane damage award. Dresdner Bank, 446 F.3d at 1380.

*4. Miller's Payment to Sea Byte*

Finally, we must review the court's award of a $750,000 credit to Miller. The court held that Miller was "entitled to a judgement of the $750,000 owed it by Hudson for the payment [Miller] made to Sea Byte." O. at 28. The court found that Hudson "admitted" that sum "must be credited in determining any compensation that might be due to Hudson. Any result entitling Hudson to retain a payment or benefit conferred on it by [Miller] would unjustly enrich Hudson." Id.

Hudson appeals, claiming that the payment Miller made to Sea Byte was gratuitous and that Hudson never agreed to such a credit. Hudson emphasizes that

20

Miller did not present any evidence at trial that it was entitled to a credit.

We affirm the district court on this issue. "Whether the district court was correct in applying equitable estoppel in this case is reviewed de novo. [T]he constituent elements of equitable estoppel constitute questions of fact, however, and are reviewed under the clearly erroneous standard." Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1138 (11th Cir. 1994) (internal citations omitted) (alteration in original). The concept of equitable estoppel does exist in federal admiralty law. See, e.g., id. The doctrine "is grounded on a notion of fair dealing and good conscience. It is designed to aid the law in the administration of justice where without its aid injustice might result." Id. (internal citation and quotation omitted). For equitable estoppel to apply there must be a representation of fact by one party contrary to a later asserted position, good faith reliance by another party, and a detrimental change in position by the later party due to the reliance. See id. at 1139.

None of the court's factual findings on this issue were "clearly erroneous." It was not clear error for the court to find that, prior to trial, Hudson admitted Miller was owed credit for its payment to Sea Byte. In Hudson's pretrial Proposed Findings of Fact and Conclusions of Law filed on September 5, 2007 Hudson offered this proposed conclusion of law:

21

Therefore, based on the 5.2 million dollar lump sum agreement [Miller] asserts it entered into to finish the job, [Miller] gets a credit for 2.698 million already paid to [Hudson], 1.3 million paid to another entity, and $750,000 it paid to Seabyte [sic], leaving them with a approximate $450,000.00 balance to [Hudson], exclusive of interest and costs for the lump sum agreement.

[A]fter the hurricanes [Hudson] provided 1.1 million dollars in value for restoration work done before they received work from other third parties.

As such, even if the Court were to find that the parties entered into a lump sum agreement to finish the job for 5.2 million (exclusive of hurricane damage) then Hudson would be owed $450,000.00 plus 1.1 million for a total of 1,550,000.00, exclusive of interests and costs.

D.E. #72 at 14-15 (emphasis added).[13]

Hudson argues it "assumed" Miller would submit evidence at trial that it was entitled to a credit, and because Miller did not do so it may not claim the credit now. However, Hudson did not qualify its statements regarding the credit or suggest that they were merely made in anticipation of what Miller would prove at trial, and Miller in fact did not offer any evidence at trial regarding its payment to Sea Byte.

---

[13] Hudson took the same position in the damage estimate it submitted to the court before trial, which subtracted the $750,000 payment from the lump sum of $5,200,000. See D.E. #87 Ex. A. Hudson's counsel also stated at the start of trial: "The second thing that we think would be appropriate, just because it's rational, is that the UK Club would get credit for having paid its settlement to our contractor, Sea Byte, $750,000." See Sept. 17 Trial Tr. at 28; see also id. at 30 (in explaining the damages Hudson was owed, Hudson's counsel stated, "you subtract [$]750,00 because, admittedly, [Miller] contributed $750,000 to satisfy an obligation of Hudson, a legal obligation. They paid that to Sea Byte, the sub-contractor.").

22

On these facts, we conclude that the court correctly estopped Hudson from changing its position as to whether Miller was entitled to a credit for its $750,000 payment to Sea Byte.

## III.  CONCLUSION

In sum, we affirm the district court's finding that the Lump Sum contract terminated based on the severe weather provision; we reverse the court's calculation of the value of Hudson's pre-hurricane work and remand for fact-finding consistent with this opinion; we affirm the court's calculation of the quantum meruit value of Hudson's post-hurricane work; and we affirm the court's credit of $750,000 to Miller for its settlement payment to Sea Byte.

**REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.**