[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-10296
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 13, 2012
JOHN LEY
CLERK

D.C. Docket No. 8:08-cv-00610-JDW-AEP


PNC BANK, NATIONAL ASSOCIATION,

                                        Plaintiff - Appellee,

                    versus

BRANCH BANKING AND TRUST COMPANY,
as acquirer of certain assets of Colonial Bank,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 13, 2012)

Before BARKETT, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

This lawsuit arises out of a loan participation agreement between Colonial Bank, the predecessor-in-interest of Branch Banking and Trust Company, and Mercantile Mortgage Company, the predecessor-in-interest of PNC Bank. Colonial administered a loan to The Hammocks Cape Haze, LLC, which obtained the loan to develop and construct condominium units. After trial, the district court ruled that Colonial breached the loan participation agreement when it unilaterally (1) permitted Cape Haze to build in excess of 92 condominium units at one time and (2) accepted "release prices" of less than $74,060 for 52 units. Branch Banking appeals the judgment entered in favor of PNC Bank. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Cape Haze planned to develop and construct 234 condominium units in 30 buildings in Southwest Florida and applied for a loan to finance the project. Colonial agreed to lend Cape Haze $34,864,174, and the two parties signed a loan agreement. Cape Haze offered as collateral the condominiums, an assignment of rents and leases, and an unconditional guaranty of payment and performance.

Colonial agreed to disburse the loan proceeds in two portions. The first portion consisted of $13,864,174 for the initial improvements to the property, and the second portion consisted of a $21 million revolving line of credit for

2

constructing condominiums. Because the second portion was a revolving line of credit, the sums advanced could be repaid and re-advanced.

The loan agreement required Colonial to release its lien on a condominium unit upon payment of a minimum "release price." The release price was to equal the greater of 90 percent of the gross list price of the condominium unit or 100 percent of the net proceeds from the sale of the condominium unit, but the release price could not be less than 125 percent of the cost to construct the unit. Colonial agreed to apply part of the "Release Price [payment] . . . to the . . . balance of [the first portion of the loan], but in no event less than Seventy-Four Thousand Sixty Dollars per Unit ($74,060.00)."

Colonial and Mercantile later entered a loan participation agreement, in which Mercantile purchased a 42.6345 percent interest in the loan. The parties agreed that Florida law would govern the enforcement and interpretation of the participation agreement. Colonial retained authority to collect payments of principal, interest, and fees and was required to remit to Mercantile its share of the proceeds. Colonial also accepted liability for any material breaches of the participation agreement, but the parties agreed that Colonial assumed no "responsibility for the financial condition of [Cape Haze], for the security value of any collateral the sufficiency thereof, or for the performance of any obligations of

3

[Cape Haze]." Mercantile and Colonial agreed to add an additional requirement to the loan agreement which provided that "[i]n no event shall [Cape Haze] have in excess of ninety-two (92) Units under construction at any one time without the Lender's prior written consent." The parties agree that "Lender" referred to Colonial. Mercantile and Colonial also agreed as follows to limit the discretion of Colonial to modify unilaterally the obligations of Cape Haze under the loan agreement: "[Colonial] may not, without [the] prior written consent [of Mercantile] . . . make . . . any . . . modification or . . . alteration in any of the material obligations, covenants or agreements of [Cape Haze] . . . under any of the Loan Documents . . . ."

After Colonial and Mercantile executed the participation agreement, Colonial loaned Cape Haze funds to construct more than 92 condominium units at one time. Each month Cape Haze submitted to Colonial requests for loan proceeds and included information about the number of units under construction. Colonial signed and approved those requests and advanced loan proceeds for those units. As of September 12, 2006, Cape Haze had 140 units under construction. As of November 20, 2006, Cape Haze had 162 units under construction.

Colonial released its lien on at least 52 condominium units even though Cape Haze had paid Colonial release prices of less than $74,060. Colonial did not

receive consent from Mercantile to accept release prices below $74,060.

In autumn of 2007, John Long, the Vice President of Mercantile, agreed to extend the maturity date of the loan, although Long knew that Colonial had released units in exchange for payments less than $74,060.

When Cape Haze defaulted on the new maturity date, Long complained to Colonial about how it had administered the loan. On December 7, 2007, Long sent to James Hogan, a Senior Credit Officer of Colonial, a letter that accused Colonial of willful mismanagement and stated that Colonial had breached the participation agreement. Long demanded that Colonial repurchase the participation interest in the loan owned by Mercantile, but Colonial refused.

After Cape Haze defaulted on the loan, PNC Bank became the successor-in-interest to Mercantile and filed a complaint against Colonial. PNC Bank alleged that Cape Haze had (1) failed to pay the minimum release prices for condominium units before Colonial released the units from the mortgage lien and (2) constructed more than 92 units at one time. PNC Bank complained that Colonial had breached its obligations under the participation agreement, which forbade Colonial from modifying the material obligations of Cape Haze without the consent of Mercantile. Branch Banking became the successor-in-interest to Colonial and answered that Colonial had not breached the participation agreement. Branch

Banking also argued that Mercantile had waived its objection to any alleged breach because Long had extended the maturity date of the loan after he had learned that Colonial had allowed Cape Haze to pay release prices less than $74,060.

After a bench trial, the district court ruled in favor of PNC Bank. The court ruled that Branch Banking owed $7,298,600 to compensate PNC Bank for the construction of more than 92 units; $711,716 to compensate PNC Bank for the release of units for less than the minimum release price; prejudgment interest of $1,736,614.08; and post-judgment interest calculated at the federal statutory rate

## II. STANDARD OF REVIEW

We review findings of fact for clear error and conclusions of law de novo. Sea Byte, Inc. v. Hudson, 565 F.3d 1293, 1300 (11th Cir. 2009). We review a damages award for "clear error" and "afford considerable deference to the district court." Hiatt v. United States, 910 F.2d 737, 742 (11th Cir. 1990). Under Florida law, "[w]hether waiver has occurred is generally a question of fact, reviewed for competent, substantial evidence." Johnson v. Harrell, 922 So. 2d 1056, 1057–58 (Fla. Dist. Ct. App. 2006). An appellate court will reverse a waiver determination "only if there is no competent substantial evidence to support the finding." Hill v. Ray Carter Auto Sales, Inc., 745 So. 2d 1136, 1138 (Fla. Dist. Ct. App. 1999).

6

## III. DISCUSSION

Branch Banking presents four issues on appeal. First, Branch Banking argues that Colonial did not breach the participation agreement when it permitted Cape Haze to construct more than 92 condominium units at one time. Second, Branch Banking argues that Colonial did not breach the participation agreement by releasing condominium units for a release price of less than $74,060. Third, Branch Banking argues that the district court clearly erred when it determined that Long's decision to extend the maturity of the loan did not waive the right of Mercantile to object to the alleged breaches of the participation agreement. Fourth, Branch Baking argues that the district court clearly erred when it calculated the damages award. We discuss each issue in turn.

*A. Colonial Did Not Breach the Participation Agreement When it Permitted Cape Haze to Build in Excess of 92 Units at a Time.*

The district court erred when it found that Colonial breached the participation agreement when it permitted Cape Haze to build in excess of 92 units at one time. The loan agreement allowed Cape Haze to obtain permission from Colonial before it built more than 92 units: "In no event shall Borrower [Cape Haze] have in excess of ninety-two (92) Units under construction at any one time without <u>Lender's prior written consent</u>." Because PNC Bank and Branch Banking

7

agree that "Lender" refers to Colonial, Cape Haze fulfilled its obligation under the loan agreement when it obtained written permission from Colonial to build more than 92 units; Colonial did not "modify" the obligations of Cape Haze when Colonial granted this permission to Cape Haze. We must give meaning to each and every word in an agreement, see Equity Lifestyle v. Fla. Mowing, 556 F.3d 1232, 1242 (11th Cir. 2009), and any other interpretation ignores the phrase, "without Lender's prior written consent."

Nothing in the agreement required Colonial to obtain the consent of Mercantile before granting Cape Haze permission to build additional units. When the parties to the participation agreement added the requirement of written consent to build more than 92 units, Mercantile could have required that Cape Haze obtain permission from both Colonial and Mercantile, but Mercantile executed an agreement that required Cape Haze to obtain permission only from Colonial.

*B. Colonial Breached the Participation Agreement When it Accepted Release Prices Less Than the Minimum Price Specified by the Loan Agreement.*

Branch Banking offers three arguments for why Colonial did not breach the participation agreement by releasing 52 units for less than $74,060: (1) the loan agreement granted Colonial the discretion to accept release prices less than $74,060; (2) Colonial could not comply with the terms of the loan agreement; and

8

(3) the decision of Colonial to accept lower release prices was reasonable under the circumstances. These arguments fail.

Branch Banking argues that Colonial had the sole discretion to determine the release prices because section 16(g) of the participation agreement forbade Colonial from releasing "any security for the loan <u>other than releases made in connection with the sale of the units to third party purchasers</u>" without the permission of Mercantile. Branch Banking argues that, because Colonial could release a condominium unit from the mortgage lien without the permission of Mercantile, Colonial could also determine the conditions of that release, but this argument fails.

Colonial breached section 16(a) of the participation agreement when it failed to obtain permission from Mercantile to waive the requirement of payment of a minimum release price. Section 16(a) of the participation agreement stated that Colonial could not modify the material obligations of Cape Haze under the loan agreement without first obtaining consent from Mercantile, and the loan agreement obliged Cape Haze to pay Colonial a release price of at least $74,060 for each unit. This obligation was material because the acceptance of a lower release price increased the riskiness of the loan.

Branch Banking defends its release of units for less than the release price on

the ground that it was impossible to calculate the cost of constructing each condominium unit, but this argument fails. Although the loan agreement required Colonial to accept no less than 125 percent of the cost to construct the condominium unit, the agreement also provided that Cape Haze had to pay Colonial at least $74,060 per unit. As the district court found, Colonial released 52 units for less than $74,060.

Branch Banking also argues that the reasons Colonial accepted lower release prices were reasonable, but the soundness of that business decision is not at issue. Section 16(a) of the participation agreement forbade Colonial from unilaterally modifying the material repayment obligations of Cape Haze. The requirement of a minimum release price was material because it was intended to ensure that a sufficient amount of the loan would be paid from the closing of each unit.

### C. Mercantile Did Not Waive the Right to Object to an Alleged Breach of the Participation Agreement.

Branch Banking argues that Mercantile waived the right to object to an alleged breach of the participation agreement when Long agreed to extend the loan with knowledge that Colonial had mismanaged the loan, but this argument fails too. Under Florida law, waiver is "the voluntary and intentional relinquishment of

10

a known right." Sacred Family Invs., Inc. v. Doral Supermkt, Inc., 20 So. 3d 412, 415 (Fla. Dist. Ct. App. 2009) (internal quotation marks omitted). Long did not "voluntar[ily] and intentional[ly] relinquish[]" the right to object when he extended the maturity of the loan because he "raised 'serious problems' with how the loan had been handled" and "wrote a blistering letter to Hogan [of Colonial], accusing Colonial of mismanagement and putting Colonial on notice that [Mercantile] considered Colonial to be in default of the participation agreement." In the light of this evidence, the district court was entitled to find that Long's decision to extend the loan maturity date as an "accommodation to [Cape Haze] . . . [in] a declining market," did not waive the right of PNC Bank, as successor to Mercantile, to sue Colonial for breach of the participation agreement.

*D. The District Court Did Not Clearly Err When it Calculated Damages.*

Branch Banking alleges that the district court erred in three ways when it calculated damages. First, Branch Banking argues that PNC Bank was not entitled to damages because Colonial and Mercantile agreed to share the risk that Cape Haze would default on the loan. Second, Branch Banking argues that the district court made too many assumptions in calculating the damages arising from the acceptance of insufficient release prices. Third, Branch Banking challenges the award of prejudgment interest to PNC Bank. Each of these contentions fail.

11

The participation agreement provided that Colonial was liable for its material breaches of the agreement, and the district court found that the damages PNC Bank suffered were caused by the breach of the participation agreement, not by bad market conditions that neither party could have foreseen. PNC Bank is entitled to damages because Colonial transformed a "prudently underwritten loan . . . into an entirely reckless act" when it unilaterally altered the "fundamental terms and conditions of the loan." Penthouse Int'l LTD v. Dominion Fed. & Sav. Loan Ass'n, 855 F.2d 963, 981 (2d Cir. 1988).

Branch Banking fails to explain how the district court clearly erred in its calculation of damages based on the acceptance of insufficient release prices. The district court determined that Colonial breached the participation agreement when it accepted release prices below $74,060 for 52 units. The district court then considered the shortfall for each of the 52 units and multiplied the total shortfall by the loan participation percentage owned by Mercantile and arrived at $711,716.

Branch Banking argues that PNC Bank "doubl[y] recover[ed]" when it received prejudgment interest from October 20, 2007, through December 20, 2007, but this argument is based on the erroneous assumption that PNC Bank received contractual interest payments from Cape Haze during the prejudgment period. The district court found that Cape Haze failed to pay any contractual

12

interest during the prejudgment period, and Branch Banking does not challenge that finding.  In its reply brief, Branch Banking argues that PNC Bank will recover interest payments and late fees from Cape Haze in the future, but an argument made for the first time in a reply brief is waived.  United States v. Dicter, 198 F.3d 1284, 1289 (11th Cir. 1999).

## IV. CONCLUSION

We **AFFIRM** the judgment against Branch Banking for the award of damages of $711,716 based on the breach of section 16(a) of the loan participation agreement by Colonial.  We **REVERSE** the judgment against Branch Banking for the award of damages of $7,298,600 based on the decision of Colonial to permit Cape Haze to construct more than 92 units simultaneously.  We **REMAND** for further proceedings consistent with this opinion.

We **AFFIRM** in part, **REVERSE** in part, **REMAND** for further proceedings consistent with this opinion.