[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-10695
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 19, 2011
JOHN LEY
CLERK

D.C. Docket No. 9:09-cv-80594-WPD

THE CITY OF RIVIERA BEACH,

Plaintiff-Appellee,

versus

THAT CERTAIN UNNAMED GRAY, TWO-STORY VESSEL
APPROXIMATELY FIFTY-SEVEN FEET IN LENGTH,
her engines, tackle, apparel, furniture, equipment and all other
necessaries appertaining and belonging in rem,

Defendant,

FANE LOZMAN,

Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 19, 2011)

Before EDMONDSON and MARCUS, Circuit Judges, and FAWSETT,[*] District Judge.

MARCUS, Circuit Judge:

Claimant-Appellant Fane Lozman appeals the district court's entry of an order of partial summary judgment and, following a two-day bench trial, an order of final judgment for Plaintiff-Appellee City of Riviera Beach ("City") in an in rem proceeding against Defendant Unnamed Gray, Two-Story Vessel Approximately Fifty-Seven Feet in Length ("Defendant"). The City filed a complaint in admiralty against the Defendant, first, claiming that the Defendant committed the maritime tort of trespass, because the Defendant remained at the City marina after the City explicitly revoked its consent, and second, seeking to foreclose its maritime lien for necessaries (unpaid dockage provided to the Defendant by the City). On partial summary judgment, the district court concluded that it had admiralty jurisdiction over the Defendant because the Defendant was indeed a "vessel" under 1 U.S.C. § 3, and that the Defendant was liable for maritime trespass.[1] After a bench trial, the district court determined that the trespass gave rise to nominal damages of $1 and that the Defendant owed the

---

[*] Honorable Patricia C. Fawsett, United States District Judge for the Middle District of Florida, sitting by designation.

[1] On appeal, Lozman does not challenge the district court's trespass ruling (except to the extent that he claims the district court lacked jurisdiction in the first place).

City approximately $3,000 under the maritime lien.  After thorough review, we **AFFIRM** the judgments of the district court in all respects.

I.

The relevant facts are these.  Lozman purchased the Defendant vessel in 2002.  After purchasing the Defendant, Lozman had it towed from a location near Fort Myers, Florida to North Beach Village, Florida, a distance of at least 200 miles.  In North Bay Village, Lozman lived in the Defendant from the time of purchase until Hurricane Wilma struck in late 2005.[2]  Lozman had the Defendant towed to the City marina in March 2006, where he continued to use the Defendant as his primary residence until its arrest in April 2009.

The City owns and operates a municipal marina on the Atlantic Intracoastal Waterway.  The marina provides wet and dry storage for approximately 510 vessels, both commercial and recreational.  The marina leases slips to vessels on both a monthly basis and at a higher daily transient rate.  On March 10, 2006, Lozman and the City marina entered into a "Wet-Slip or Dry Storage Agreement" (the "Agreement").  It called for Lozman to pay a monthly dockage fee of

---

[2]  According to Lozman, he moved the Defendant to two different marinas in North Bay Village after he was evicted from another marina for attempting to require that marina to provide reasonable accommodation -- in the form of a wheelchair ramp -- for his disabled houseboat neighbor.

3

$1,174.48 by the first of each month, and dockage was provided on a month to month basis. It is undisputed that Lozman paid the entire monthly dockage fee for the month of March 2006, although he arrived at the marina some time in the middle of the month.

Conflict -- indeed, litigious conflict -- between the City and Lozman erupted shortly after Lozman's arrival. According to Lozman, on May 10, 2006, one day before then-Governor Jeb Bush signed an anti-eminent domain bill, the City entered into an agreement with a private developer for the redevelopment of the marina. Seeking to scuttle the redevelopment agreement, Lozman filed suit in Palm Beach County Circuit Court, alleging that the City's May 10, 2006 meeting with the developer violated the Florida Sunshine Law, Fla. Stat. § 286.011, because the public was only given one day's notice of the meeting. While it is not clear from the record how that lawsuit was resolved, the redevelopment plan was ultimately postponed or abandoned, a result for which Lozman takes credit.

On August 9, 2006, the City issued Lozman a notice of eviction from the marina, and subsequently filed an eviction suit also in the Circuit Court for Palm Beach County. The City's purported reasons for the eviction were that Lozman had failed to muzzle his ten-pound daschund and had used unlicensed repair persons to perform work on the Defendant. In the eviction proceedings, the City

argued on summary judgment that the Agreement between Lozman and the City established a nonresidential tenancy under Florida law. The Circuit Court agreed that the Agreement established a nonresidential tenancy under Florida law and was therefore governed by Florida's landlord-tenant statute. The court, however, denied the City's motion for summary judgment because Lozman had raised an issue of material fact as to whether the eviction was improper retaliation for his opposition to the redevelopment plan. On March 2, 2007, after a three-day trial, a jury returned a verdict in Lozman's favor, finding that Lozman's protected speech was a substantial or motivating factor in the City's attempt to terminate the lease, and that the attempted termination would not have occurred absent the protected speech. Lozman continued to pay the monthly dockage fee throughout the proceedings, and remained at the marina.

On June 14, 2007, a few months after Lozman's state court victory, the Riviera Beach City Council unanimously passed a resolution adopting a revised dockage agreement and accompanying Marina Rules & Regulations. The revised agreement and rules and regulations require all vessels docked at the marina and their owners to: (1) secure and maintain liability insurance to specified limits and name the marina as an additional insured; (2) show proof of valid registration or documentation; (3) be operational and capable of vacating the marina in case of an

emergency; and (4) comply with the Florida Clean Vessel Act, Fla. Stat. § 327.53, which, among other things, prohibits owners of vessels or floating structures from discharging raw sewage into Florida waters.

The City marina sent numerous letters to all marina residents and customers describing the new requirements. On or about July 25, 2007, the marina sent its initial notice of the new requirements and provided residents and customers with the revised dockage agreement to be executed by September 30, 2007. The marina sent customers an additional letter on November 13, 2007, further describing the new insurance requirements. On January 25, 2008, the marina sent Lozman a letter repeating the new insurance requirements and listing deficiencies in his and the Defendant's compliance with the marina's new rules and regulations. Specifically, the letter informed Lozman that he needed to sign a revised dockage agreement, that he lacked sufficient insurance coverage for the Defendant, and that he needed to provide insurance and registration documentation to the marina. Two months later, the marina performed an assessment of the vessels' compliance with the City resolution, and determined that seventeen vessels docked at the marina, including the Defendant, were not in compliance.[3] On April 22, 2008, the

_____

[3] Of the seventeen vessels that were not in compliance as of the March 2008 assessment, some later came into compliance or vacated the marina; others were abandoned by their owners; and others were donated to charity and removed from the marina. The Defendant was the only

marina sent Lozman a letter informing him that he had missed the deadline to execute a new agreement and procedures to enforce the City's rights would be implemented against the Defendant.

Lozman claims that he never received these letters. He does not dispute, however, that he received a letter from the marina dated March 6, 2009, which provided final notice of the marina's revocation of permission for the Defendant to remain at the marina unless (1) Lozman brought the Defendant into compliance with the City resolution's new requirements, (2) Lozman paid the outstanding balance on the account, and (3) Lozman executed the revised dockage agreement. The letter stated that "[s]hould your vessel remain and you fail to pay your account in full, execute the 'Marina Dockage Agreement,' and otherwise bring your vessel into compliance with the Agreement's provisions by **April 1, 2009**, the City will promptly institute legal proceedings against you and your vessel for trespass and to foreclose the City's lien on your vessel." It is undisputed that Lozman never executed the new agreement and that the Defendant remained at the marina after April 1, 2009.

Accordingly, on April 20, 2009, the City filed a two-count verified complaint in admiralty against the Defendant to foreclose its maritime liens for

noncompliant craft as of April 1, 2009.

"necessaries" (dockage provided by the City marina to the Defendant), under 46 U.S.C. § 31342,[4] and for trespass.  The United States District Court for the Southern District of Florida issued a warrant for the arrest of the Defendant under Supplemental Rule C for Certain Maritime and Admiralty Claims, which provides, in relevant part, that "[i]f the conditions for an in rem action appear to exist, the court must issue an order directing the clerk to issue a warrant for the arrest of the vessel or other property that is the subject of the action."  Fed. R. Civ. P. Supp. Rule C(3)(a)(i).  On the afternoon of April 20, 2009, the United States Marshal arrested the Defendant, and had it towed from the City marina to Miami, Florida, a distance of approximately eighty miles.  The next day, Lozman filed, pro se,[5] an emergency motion to dismiss the complaint and return the Defendant to the

---

[4]  46 U.S.C. § 31342 provides:

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner--
       (1) has a maritime lien on the vessel;
       (2) may bring a civil action in rem to enforce the lien; and
       (3) is not required to allege or prove in the action that credit was given to the vessel.
(b) This section does not apply to a public vessel.

[5]  Lozman proceeded pro se for the entirety of the case below, including the bench trial. He now has representation on appeal.

8

marina.  After a hearing on April 23, 2009, the district court denied Lozman's motion.

On August 12, 2009, the City moved for partial summary judgment on its maritime trespass claim.  After considering Lozman's response, the district court granted the City's motion, finding that the Defendant was a "vessel" for purposes of federal admiralty jurisdiction.  The district court also found that the Defendant was trespassing on the marina as of April 1, 2009.  Lozman had received notice of the Defendant's failure to comply with the marina rules and regulations in early March 2009, and the notice expressly terminated the City's consent as of April 1, 2009.  The Defendant, however, remained at the marina until its arrest on April 20, 2009.  The district court concluded that the Defendant vessel remained at the marina after the City terminated consent.

On November 23 and 24, 2009, the district court held a two-day bench trial on the issues of damages for the trespass claim, and liability and damages for the maritime lien for necessaries claim.  On January 6, 2010, the district court entered its findings of fact and conclusions of law, and issued an order of final judgment in the City's favor.  The district court found that the Defendant's account was delinquent as of April 20, 2009 in the amount of $3,039.88.  The court credited the City marina's ledger and the testimony of the City's forensic accountant in

determining the amount owed. The court found no real harm resulting from the trespass, awarding the City nominal damages of $1.

On February 25, 2010, the entry of final judgment was amended to include $3,053.26 in prejudgment interest plus custodial fees. The district court also ordered the U.S. Marshal to release the Defendant and execute its sale in satisfaction of the judgment. Lozman filed an emergency motion to stay the sale and to stay enforcement of the district court's final judgment in this Court, which was denied on March 3, 2010. The City purchased the Defendant in a Bill of Sale executed on March 4, 2010. This timely appeal of both the district court's partial summary judgment and final judgment orders followed.

## II.

The standard of review for a district court's grant of summary judgment is well settled. "This court reviews a district court's grant of summary judgment de novo, applying the same legal standards used by the district court." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010). "Summary judgment is appropriate where, viewing the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party, there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law." Id.; see also Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).

As for the district court's entry of final judgment after a bench trial, "[w]e review a district court's factual findings when sitting without a jury in admiralty under the clearly erroneous standard. We review the district court's conclusions of law de novo." Sea Byte, Inc. v. Hudson Marine Mgmt. Servs., Inc., 565 F.3d 1293, 1298 (11th Cir. 2009) (quoting Venus Lines Agency, Inc. v. CVG Int'l Am., Inc., 234 F.3d 1225, 1228 (11th Cir. 2000)). "A finding of fact is clearly erroneous when the entirety of the evidence leads the reviewing court to a definite and firm conviction that a mistake has been committed." Id. (quoting Dresdner Bank AG v. M/V Olympia Voyager, 446 F.3d 1377, 1380 (11th Cir. 2006)).

Lozman first claims that the district court incorrectly concluded on summary judgment that the Defendant was a "vessel" subject to federal admiralty jurisdiction. He further says that the City did not have a maritime lien because the Defendant did not owe the City money for dockage, but rather the City owed Lozman. Lozman also asserts that the City improperly instituted this admiralty action in retaliation against him for the exercise of his First Amendment rights in opposing the City's development plan for its marina, and that the district court erred in finding that Lozman had failed to establish such a defense. Finally, Lozman argues that his March 2007 success in resisting an eviction attempt by the City in state court precludes the City, under the doctrines of judicial and collateral

11

estoppel, from bringing a federal maritime claim against him in May 2009, and that the district court erred in declining to apply either estoppel doctrine. We consider each claim in turn.

A.

The United States Constitution extends the judicial power of the United States "to all Cases of admiralty or maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. Under that clause, Congress has granted federal district courts exclusive original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). This is an in rem case against the Defendant for the maritime tort of trespass and for the enforcement of a maritime lien for necessaries. A "mandatory prerequisite" to the district court's admiralty jurisdiction over the Defendant, and to the attachment of a maritime lien, is that the Defendant be a "vessel" under federal law.[6] Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 872 (11th Cir. 2010). We review the district court's conclusion that the

---

[6] Lozman spends considerable ink describing Florida state law and the difference under Florida law between a "floating residential structure" and a "vessel." Lozman claims that the Defendant is a "floating residential structure," not a "vessel," as the terms are defined under Florida law. These arguments miss the point. Federal law governs the existence of admiralty jurisdiction, and the term "vessel" is specifically defined in the United States Code. Accordingly, for purposes of federal admiralty jurisdiction, any differences among the definitions of vessel under the laws of various states or between state and federal law must yield to the federal definition and the required uniformity of federal maritime law. See Stewart v. Dutra Constr. Co., 543 U.S. 481, 490 (2005) ("[1 U.S.C.] § 3 continues to supply the default definition of 'vessel' throughout the U.S. Code . . . ."); S. Pac. Co. v. Jensen, 244 U.S. 205, 215-16 (1917).

12

Defendant was a "vessel" de novo.  Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 922 (11th Cir. 2001).

The determination of whether the Defendant is a "vessel" is dictated by binding precedent.  Both this Court and the former Fifth Circuit in binding precedent have employed a broad definition of vessel pursuant to 1 U.S.C. § 3. Section 3 provides, in full: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3 (emphasis added).  We have unambiguously said that the primary inquiry in determining whether a craft is a vessel is whether the craft was "rendered practically incapable of transportation or movement."  Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299, 1312 (11th Cir. 2008) (quoting Stewart, 543 U.S. at 494).  In so doing, we have echoed the Supreme Court's pronouncement in Stewart, 543 U.S. 481, that the determination of whether a craft is a "vessel" focuses on "whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one."  Id. at 496.  We therefore look at the capability of the craft, "not its present use or station."  Belle of Orleans, 535 F.3d at 1310.

Our cases provide further context for this broad definition.  In Pleason v. Gulfport Shipbuilding Corp., 221 F.2d 621 (5th Cir. 1955), the Carol Ann, a

13

salvage and repair vessel built for the Navy, had been declared surplus and was subsequently sold and re-sold to private parties. Id. at 622. One of the vessel's owners decided to scrap the vessel, and at the time the vessel was brought in for certain repairs, she was in the following condition: "her propellers and propeller shafts had been removed; she had no crew; none of her machinery was in operation; she had no light, heat, or power in operation; her main engines had been completely removed; all of her steering apparatus, with the exception of the rudder, had been removed and sold; her superstructure and masts were intact; her navigation lights were in place, though not operable; [and] her compartmentation, including cargo holds, was intact." Id. at 622-23. After these repairs were performed, the Carol Ann was moored to a dock by cables, and she received telephone and electrical service through connections to sources on land. Id. at 623. Although the Carol Ann was almost completely gutted, except for her superstructure, the former Fifth Circuit[7] held that she was a vessel. Id. The Court, as it had done in the past, "saw fit to emphasize the words 'capable of being used' in discussing Section 3 of Title 1." Id. The Carol Ann was afloat and capable of being towed, had a deck, cabins, and superstructure, and therefore "was capable of

---

[7] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

being used as a means of transportation under tow" despite having "no steering mechanism" and "no motive power of its own." Id.

The case of Miami River Boat Yard, Inc. v. 60' Houseboat, Serial No. SC-40-2860-3-62, 390 F.2d 596 (5th Cir. 1968) is equally instructive. There, a panel of the former Fifth Circuit concluded that a houseboat with no motive power of her own that was used as a residence in a marina was still a vessel. Id. at 597. The undisputed facts showed that the defendant houseboat had "made the rather considerable maritime voyage to libelant's shipyard in Miami . . . with the expectation that she would be towed away." Id. The Court noted that a houseboat "affords a water-borne place to live with the added advantage of at least some maritime mobility." Id. Accordingly, "[t]hat she has no motive power and must, as would the most lowly of dumb barges, be towed does not deprive her of the status of a vessel." Id.

More recently, in 2008, we had occasion in Belle of Orleans to consider whether a riverboat casino that was moored to a dock by steel cables and had electrical, computer, and phone cables attached to a shore side source was a vessel. 535 F.3d at 1304. We held that it was. A panel of this Court reaffirmed that Pleason was still good law and that it "addressed precisely the legal issue we face in the instant case." Id. at 1306. We also found the riverboat at issue to be

15

factually indistinguishable from the vessel in Pleason, with the exception that the riverboat had a working engine and other machinery and therefore motive power of its own. Id. at 1307. That distinction, of course, led us further toward the conclusion that the riverboat was capable of maritime transport and was, therefore, a vessel, but we did not depart from the Pleason analysis. Id.

We distinguished both legally and factually the Fifth Circuit's opinion in Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560 (5th Cir. 1995), on which Lozman now relies, where the court held that a floating casino that was semi-permanently and indefinitely moored to the shore was not a vessel because it was "removed from navigation" and "was constructed to be used primarily as a work platform." Id. at 570. We rejected the reasoning of the Fifth and Seventh[8] Circuits, both of which "focus on the intent of the shipowner rather than whether the boat has been 'rendered practically incapable of transportation or movement.'" Belle of Orleans, 535 F.3d at 1311 (quoting Stewart, 543 U.S. at 494). Again we observed that "[t]he owner's intentions with regard to a boat are analogous to the boat's 'purpose,' and Stewart clearly rejected any definition of 'vessel' that relies on such a purpose." Id. at 1311 (citing Stewart, 543 U.S. at 497 ("Under [1 U.S.C.] § 3, a 'vessel' is any watercraft practically capable of maritime

---

[8] See Tagliere v. Harrah's Ill. Corp., 445 F.3d 1012 (7th Cir. 2006).

16

transportation, regardless of its primary purpose . . . .") (footnote omitted)).

Moreover, we noted that "such a test is incompatible with the Supreme Court's focus on providing uniformity within admiralty jurisdiction," id. (citing Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 902 (11th Cir. 2004)), because "state law can change" and "an owner's intentions may change in ways never anticipated," id. at 1311-12.

A panel of this Court reiterated the analysis employed in Belle of Orleans and the enduring vitality of Pleason and 60' Houseboat still again in Crimson Yachts, 603 F.3d 864. After reviewing the purpose and history of maritime liens and prior precedent interpreting the term "vessel," the Court noted that a "case-by-case approach is often necessary to determine whether admiralty jurisdiction applies to novel or unusual situations." Id. at 875 (internal quotation marks omitted). We ultimately held that the Betty Lyn II, a yacht that had been drydocked, removed from the water with cranes, and temporarily disabled for extensive repairs, was still a vessel. Id. We stated that "[t]he BETTY LYN II need merely be capable of transportation on water to be a vessel. The law does not require that she be able to self-propel." Id. (citing Belle of Orleans, 535 F.3d at 1307; 60' Houseboat, 390 F.2d at 597). Although the yacht was on dry land for

17

repairs, it retained the status of vessel because it still "could be towed upon 24 hours notice." Id.

Lozman's efforts to distinguish Pleason and the line of precedent that followed are unavailing. Aside from his discussion of Florida law, which is of no moment in defining the term "vessel" for purposes of federal admiralty jurisdiction, Lozman raises three somewhat interrelated arguments in an effort to avoid controlling precedent. First, he argues that the Defendant was not practically capable of transportation over water, even by tow. The record disputes Lozman's characterization. The Defendant in this case is virtually indistinguishable from the vessels in the aforementioned cases in terms of its capacity for maritime transport. Like the vessel in Pleason, the Defendant was moored to a dock by cables, received power from land, and had no motive power or steering of its own. Moreover, the Defendant was towed several times over considerable distances: first, from the place of purchase near Fort Myers to North Bay Village; next, among several marinas in North Bay Village; then, from North Bay Village down to the City; and finally, after its arrest, from the City to Miami.

Lozman claims, nevertheless, without any evidentiary support in the record, that each of the three times the Defendant was moved over 250 feet it sustained serious damage and that it would have sunk two out of the three times if

18

immediate underwater repairs had not been performed. But absent a shred of evidence, and in light of the contradictory evidence of the actual voyages made by the Defendant under tow, this assertion alone cannot preclude a determination that the Defendant was practically capable of maritime transportation. In addition, as the district court recognized, in Belle of Orleans, the claimant raised a similar concern that moving the vessel would damage it, and we stated that "the BELLE OF ORLEANS was capable of moving over water, albeit to her detriment, and was capable of being transported under tow. As such, we hold that the BELLE OF ORLEANS is a 'vessel' for purposes of admiralty jurisdiction." 535 F.3d at 1312 (emphasis added).

Second, Lozman argues, again without any record support, that the Defendant was constructed using methods and materials appropriate for houses on land and, accordingly, that the Defendant is not a vessel. Thus, Lozman asserts that the Defendant is a "floating shack, built out of plywood with only 1/16" of fiberglass surrounding its unraked hull, without proper cleats for towing,[9] no bilge pumps, no navigation aids, no lifeboats and other lifesaving equipment, no

---

[9] Lozman's own brief and the evidence presented at trial appear to contradict this point. Before he even arrived in the City, and thus before the attachment of a maritime lien and the district court's exercise of its admiralty jurisdiction over the Defendant, Lozman had a repairperson fit the Defendant with four towing bitts prior to its approximately-seventy mile tow from North Bay Village to the City marina.

19

propulsion, [and] no steering."  In essence, Lozman claims that the Defendant "was designed as a residence that just happened to float."  But the Defendant's design, however unusual or unorthodox, is of little moment.  We clearly stated in Belle of Orleans that the status of "vessel" does not depend in any way on either the purpose for which the craft was constructed or its intended use.  535 F.3d at 1311.

Lozman also uses these claims about the Defendant's construction to again suggest that the Defendant was not practically capable of moving over water, even by tow.  But that argument, too, is contradicted by the record.  The fact that the Defendant was an unusually designed craft is relevant only to the extent that the design prevents it from having any practical capacity for transportation over water, and the record is clear that the Defendant had this practical capacity.  See Burks v. Am. River Transp. Co., 679 F.2d 69, 75 (5th Cir. Unit A 1982) ("No doubt the three men in a tub would also fit within our definition [of "vessel"], and one probably could make a convincing case for Jonah inside the whale."); McCarthy v. The Bark Peking, 716 F.2d 130, 134 (2d Cir. 1983) ("[V]irtually any capacity for use as seagoing transportation -- perhaps even the hypothetically plausible possibility has sufficed to lend the dignity of 'vessel' status to a host of seemingly unlikely craft.").

20

Finally, Lozman argues that the Defendant did not have a Hull Identification Number ("HIN") and could not obtain Coast Guard certification, both of which are required for legal navigability, and that therefore it cannot be considered a vessel. This argument misapprehends the relevant inquiry. As we recognized in Belle of Orleans, legal navigability is not the test for vessel status. 535 F.3d at 1311-12 ("[I]f legal navigability is the test for vessel status, any ship with an expired Coast Guard certification becomes a non-vessel . . . . Such a result is clearly not what the Supreme Court intended [in Stewart]."). Lozman claims the Defendant is distinguishable from the hypothetical vessel in Belle of Orleans because the Defendant could never obtain a Coast Guard certification in the first place. But in distinguishing this Court's hypothetical illustration of a principle, he fails to dispute -- nor could he dispute -- the principle itself; namely, that we do not consider legal navigability at all in determining whether a craft is a vessel, but rather only the craft's practical capacity for maritime transport.

In short, based on long precedent, the Defendant is a "vessel" under 1 U.S.C. § 3. Like the vessels in Pleason and 60' Houseboat, the Defendant was practically capable of transportation over water by means of a tow, despite having no motive or steering power of its own. The district court did not err in concluding that it had federal admiralty jurisdiction over the Defendant.

21

## B.

Under 46 U.S.C. § 31342, a "person providing necessaries to a vessel" has a maritime lien on the vessel that may be enforced by means of an in rem civil action against the vessel. 46 U.S.C. § 31342(a). We have held that dockage, which was undisputedly provided by the City marina to the Defendant, constitutes "necessaries" for purposes of maritime law. Belle of Orleans, 535 F.3d at 1314 (citing Inbesa Am., Inc. v. M/V Anglia, 134 F.3d 1035, 1037-38 (11th Cir. 1998)).

Lozman does not dispute the legal standard for a maritime lien, but rather argues that the City has failed to prove that a maritime lien accrued in this case because he allegedly did not owe any money to the marina. The proper balance of Lozman's dockage account with the marina is a question of fact and was the primary issue in the two-day bench trial before the district court. Accordingly, we review the district court's factual determinations for clear error. Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1211 (11th Cir. 2010). A "court will not disturb a district court's findings of fact under the clearly erroneous standard unless it is left 'with the definite and firm conviction that a mistake has been made' after making all credibility choices in favor of the fact-finder's choice, in light of the record as a whole." Meek v. Metro. Dade Cnty., 985 F.2d 1471, 1481 (11th Cir. 1993), abrogated on other grounds by Dillard v. Chilton Cnty. Comm'n, 495 F.3d 1324

22

(11th Cir. 2007) (per curiam) (quoting Maddox v. Claytor, 764 F.2d 1539, 1545 (11th Cir. 1985)). An appellate court may not reverse a district court's finding that is plausible in light of the entire record even if "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985).

Based primarily on the marina's records and the in-court testimony of marina director Edwin Legue, forensic accountant Glenn Troast, and Lozman himself, the district court found that Lozman owed the marina "$805.78 for unpaid dockage" and "$608.60 for unpaid late fees" as of March 31, 2009, and "$1624.50 in dockage at the transient rate for [the] period from April 2, 2009 to April 20, 2009, inclusive," for a total of $3,038.88.

Lozman makes several arguments in response, all of which invite us to reconsider the well-grounded factual findings of the district court. First, Lozman claims that one of his checks was not properly credited to his account. Second, Lozman asserts that he was erroneously charged late fees. Third, Lozman contends that he is entitled to a prorated dockage fee for the month of March 2006, because he paid for the full month but did not dock the Defendant at the marina until on or around March 17. Finally, Lozman claims that the marina owes him a

credit for fifteen months of spotty or non-existent electrical service. We consider each claim in turn.

First, Lozman says that his September 2008 dockage fee check, #1157, was cashed by the City but was not properly credited to his account. As evidence, Lozman claims that his marina billing statement dated April 1, 2009, did not show a credit for this check. But the district court did not rely on the April 1, 2009 billing statement in computing the amount owed. Instead, the evidence upon which the district court relied was the marina's ledger card for Lozman's account, and the testimony of the City's forensic accountant, Glenn Troast, which was based on a review of that ledger. And the ledger has an entry for the amount of check #1157 on the date it was sent, September 9, 2008. The district court therefore found that check #1157, in addition to the other checks Lozman claimed were not properly credited to his account, were properly accounted for in the ledger.

Lozman further claims that the marina accounting staff intentionally held three of his checks for up to three months before depositing them. Presumably, Lozman is suggesting that the City's actions led him to unfairly incur late fees. At trial, however, forensic accountant Troast testified that Lozman was credited for any late fees that were assessed against him while those checks were being held.

Indeed, the ledger shows that, on July 9, 2008, shortly after the City deposited the three checks in question, Lozman's account was credited $473.11 for past late fees.[10] At all events, we can find no clear error in the district court's factfinding.

Lozman's next claim is that he is entitled to a prorated dockage fee for March 2006, his first month at the marina. It is undisputed that Lozman paid the monthly fee in full and that he arrived at the marina on or around March 17, 2006. But those two undisputed facts alone do not lead to the conclusion that Lozman was entitled to pay a prorated dockage fee. Nothing in the Agreement itself addresses the issue of prorated monthly payments, and nothing in the record suggests that Lozman ever demanded a credit or proration of his March 2006 payment before this case began. Without more, the district court did not commit clear error by declining to find that the City owed Lozman a prorated portion of his March 2006 dockage fee.

Finally, Lozman asserts that he was owed "15 months electric, $750.00, for one outlet he paid for that never worked and that he did not use." Although Lozman claims that his electricity did not work for two years, the record lacks any

---

[10] Lozman also received substantial credits on other occasions. Thus, for example, the forensic accountant testified at trial that, in August 2007, the marina forgave a full month of unpaid dockage fees for July 2007, effectively crediting Lozman's account the unpaid amount.

evidence -- not even a single electrical bill -- to support this claim. In addition, it is undisputed that the City credited Lozman $450 for nine months of electrical service on July 9, 2008, because of alleged service interruptions.

At the end of the day, nothing in the record indicates that we may second-guess the district court's weighing of the evidence. We are not persuaded that the district court erred in its factfinding, and neither are we left, therefore, "with the definite and firm conviction that a mistake has been made." Maddox, 764 F.2d at 1545. The district court's factual findings regarding the amount Lozman owed under the City's maritime lien for necessaries were not clearly erroneous.

C.

Lozman claims next that the City's federal admiralty complaint against the Defendant "was simply part of an ongoing retaliation by the CITY against LOZMAN for his success (with the support of then Governor Bush and then Attorney General Crist) in stopping the CITY from using eminent domain to take thousands of homes and businesses, along with the CITY marina, to be given to a private developer in a 2.4 billion dollar redevelopment deal," as well as for his success in the state court eviction case.

In order to successfully advance a First Amendment retaliation defense, Lozman must show (1) that his conduct was constitutionally protected; and (2) that

26

his conduct "was a substantial or motivating factor in" the City's decision to arrest the Defendant. Cuban Museum of Arts & Culture, Inc. v. City of Miami, 766 F. Supp. 1121, 1125 (S.D. Fla. 1991) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); see also Gattis v. Brice, 136 F.3d 724, 726 (11th Cir. 1998) ("To succeed in a section 1983 suit based on a claim of retaliation for speech, the plaintiff must show that his speech was a substantial or motivating factor in the allegedly retaliatory decision." (internal quotation marks omitted)). If Lozman makes this showing, the burden then shifts to the City to show "by a preponderance of the evidence" that the action against the Defendant would have occurred "even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287; see also Cuban Museum, 766 F. Supp. at 1125.

The district court concluded on summary judgment that Lozman had failed to show that his 2006 opposition to the marina redevelopment plan was a substantial or motivating factor in the City's decision to bring this case. The court, therefore, did not reach the question of whether Lozman's conduct was constitutionally protected or whether the City could show by a preponderance of the evidence that the arrest of the Defendant would have occurred even in the absence of Lozman's conduct. The district court noted that, while the timing of the City resolution mandating compliance with revised marina rules and

27

regulations -- which occurred three months after Lozman's victory in the state court eviction case -- was "enough to raise eyebrows," it was still not enough, absent <u>any</u> firm evidence, to show that Lozman's speech was a substantial or motivating factor in the City's decision to implement those rules and to arrest the Defendant. The district court further found that the evidence submitted by Lozman -- much of which was inadmissible, and which consisted primarily of (1) the minutes from a City Council meeting held approximately one year before the decision to change the rules was made, and (2) newspaper articles asserting that the rules changes were effectuated as a personal vendetta against Lozman -- suggested at most an ongoing feud between Lozman and the City, but did "not establish a connection between Mr. Lozman's protected conduct and the specific action at issue here: the changing of the marina rules and their enforcement against the Defendant vessel."

The district court's conclusions were sound. On appeal, Lozman argues that what "is enough to raise eyebrows" -- here, the timing of the rules changes -- is circumstantial evidence sufficient to preclude summary judgment. We are unpersuaded. It is certainly true that "[w]here the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary judgment is improper." <u>Chapman v. Am. Cyanamid Corp.</u>, 861

F.2d 1515, 1518-19 (11th Cir. 1988). "However, an inference based on speculation and conjecture is not reasonable." Id. at 1518. As noted by the City, "circumstantial evidence must do more than simply 'raise some eyebrows'; it must be sufficient to raise a jury question." Lozman has presented no evidence in the record to support his retaliation claims beyond the timing of the rules changes. And that timing is hardly enough to raise a genuine issue of material fact.

Indeed, the evidence that is in the record overwhelmingly contradicts Lozman's claims. To begin with, the new marina rules did not apply solely to the Defendant. Rather, the Defendant was one of seventeen vessels that were not in compliance with the new rules, and, on April 1, 2009, was the only non-compliant vessel remaining at the marina. Thus, there is no evidence to suggest that the Defendant was specifically targeted. The City's stated goals behind the revisions to the marina rules were "to become more fully compliant with state and federal laws and to better insulate the City from financial loss and liability exposure." Lozman marshals no evidence to dispute any of this.

Perhaps most significantly, the causal link between the March 2, 2007 state court eviction verdict in Lozman's favor and the June 20, 2007 rules changes is highly attenuated, if not wholly implausible. Notably, between those two events there was a new City Council election, which completely changed the composition

29

of the City Council. As Lozman himself testified at the bench trial: "[T]he elections in Riviera Beach are in March. So the March, 2007, election all new people came in. And the feeling around town was they came in -- that my win and the eminent domain defeat had a lot to do with it." Indeed, Lozman supported the campaigns of two of the new council members elected in 2007, who then turned around and signed the <u>unanimous</u> City Council resolution authorizing the marina's new rules and regulations.

The district court did not err in granting summary judgment to the City on Lozman's affirmative defense of retaliation. Like the district court, we need not reach the questions of whether Lozman's speech was constitutionally protected and whether the City's rules changes and arrest of the Defendant would have occurred in the absence of Lozman's speech.

III.

Lozman's final argument is that the City was judicially estopped from bringing a federal maritime claim against the Defendant in light of the City's argument in state court that Lozman's dockage agreement with the marina gave rise to a nonresidential tenancy subject to Florida law. Lozman's argument is without merit. Judicial estoppel is "designed to prevent parties from making a mockery of justice by inconsistent pleadings." <u>McKinnon v. Blue Cross & Blue</u>

30

Shield of Ala., 935 F.2d 1187, 1192 (11th Cir. 1991).  While judicial estoppel "cannot be reduced to a precise formula or test," Zedner v. United States, 547 U.S. 489, 504 (2006), three factors typically inform the inquiry: (1) whether there is a clear inconsistency between the earlier position and the later position; (2) a party's success in convincing a court of the earlier position, so that judicial acceptance of the inconsistent later position would create the perception that either the earlier or later court was misled; and (3) whether the inconsistent later position would unfairly prejudice the opposing party if not estopped.  Jaffe v. Bank of Am., N.A., 395 F. App'x 583, 587 (11th Cir. 2010) (per curiam) (unpublished); see also Zedner, 547 U.S. at 504.

The first factor is crucial; without inconsistency there is no basis for judicial estoppel and no reason even to reach the other two factors.  See Zedner, 547 U.S. at 506.  Lozman does not even begin to show how there could be a "clear inconsistency" between the City's earlier position that a dockage agreement between him and the City is governed by state landlord-tenant law and the City's current position that the Defendant is a vessel subject to federal admiralty jurisdiction.  Because there is no clear inconsistency here, the district court correctly concluded that the City was not estopped from bringing its action in admiralty against the Defendant.

31

Lozman makes a second estoppel argument, which is equally unpersuasive. Specifically, Lozman asserts that, because the state court ruled that the City's 2006 eviction attempt was improper retaliation, under the doctrine of collateral estoppel, the district court was required to rule that the City's admiralty action was also improper retaliation against him for the exercise of his First Amendment rights. An element of collateral estoppel is that "the issue at stake must be identical to the one alleged in the prior litigation." Greenblatt v. Drexel Burnham Lambert, Inc., 763 F.2d 1352, 1360 (11th Cir. 1985).[11]  Moreover, "[t]he application of collateral estoppel is committed to the sound discretion of the district court," id., and, accordingly, we review the district court's decision whether or not to apply collateral estoppel for abuse of discretion. Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1341 (11th Cir. 2004).

The district court could not have abused its discretion in declining to apply collateral estoppel, because the issues at stake here are significantly different from those in dispute in the state court proceeding.  In this case, the issues before the district court were whether the Defendant was a vessel, whether the Defendant was

---

[11] "There are several prerequisites to the application of collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action." Greenblatt, 763 F.2d at 1360 (citing DeWeese v. Town of Palm Beach, 688 F.2d 731, 733 (11th Cir. 1982)).

trespassing, and whether the City held a maritime lien for necessaries on the Defendant (and the amount owed under that lien). None of these issues were previously litigated. Lozman contends that the "identical" issue at stake is whether the City retaliated against him "for the exercise of his First Amendment rights, which issue was resolved in his favor in the state court action." But this statement of the issue is misleading. The factual predicate for the retaliation claim, as we have discussed, has wholly changed since the 2007 state court verdict in Lozman's favor. There is a new City Council, which passed a unanimous resolution revising the marina rules and regulations, and this is an <u>in rem</u> action against the Defendant based in large part on Lozman's failure to comply with those rules and regulations (and on Lozman's failure to pay dockage fees). The City's earlier 2006 eviction attempt -- the purported reasons for which were Lozman's failure to muzzle his small dog and his use of unapproved repairpersons -- is not identical or even similar -- factually or legally -- to the City's 2009 admiralty action. The district court was not required to give any credence to the state court proceedings in this case, and did not abuse its discretion in declining to apply collateral estoppel.

The district court's orders of partial summary judgment and final judgment in favor of the City are **AFFIRMED**.