*118 Justice Breyer
delivered the opinion of the Court.
The Rules of Construction Act defines a “vessel” as including “every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.” 1 U. S. C. § 3. The question before us is whether petitioner’s floating home (which is not self-propelled) falls within the terms of that definition.
In answering that question we focus primarily upon the phrase “capable of being used.” This term encompasses “practical” possibilities, not “merely . . . theoretical” ones. Stewart v. Dutra Constr. Co., 543 U. S. 481, 496 (2005). We believe that a reasonable observer, looking to the home’s physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water. And we consequently conclude that the floating home is not a “vessel.”
Í—i
In 2002 Fane Lozman, petitioner, bought a 60- by 12-foot floating home. App. 37, 71. The home consisted of a house-like .plywood structure with French doors on three sides. Id., at 38, 44. It contained a sitting room, bedroom, closet, bathroom, and kitchen, along with a stairway leading to a second level with office space. Id., at 45-66. An empty bilge space underneath the main floor kept it afloat. Id., at 38. (See Appendix, infra, for a photograph.) After buying the floating home, Lozman had it towed about 200 miles to North Bay Village, Florida, where he moored it and then twice more had it towed between nearby marinas. In 2006 Lozman had the home towed a further 70 miles to a marina owned by the city of Riviera Beach (City), respondent, where he kept it docked. Brief for Respondent 5.
After various disputes with Lozman and unsuccessful efforts to evict him from the marina, the City brought this federal admiralty lawsuit in rem against the floating home. It sought a maritime lien for dockage fees and damages *119 for trespass. See Federal Maritime Lien Act, 46 U. S. C. §31342 (authorizing federal maritime lien against vessel to collect debts owed for the provision of “necessaries to a vessel”); 28 U. S. C. § 1333(1) (civil admiralty jurisdiction). See also Leon v. Galceran, 11 Wall. 185 (1871); The Rock Island Bridge, 6 Wall. 213, 215 (1867).
Lozman, acting pro se, asked the District Court to dismiss the suit on the ground that the court lacked admiralty jurisdiction. See 2 Record, Doc. 64. After summary judgment proceedings, the court found that the floating home was a “vessel” and concluded that admiralty jurisdiction was consequently proper. Pet. for Cert. 42a. The judge then conducted a bench trial on the merits and awarded the City $3,039.88 for dockage along with $1 in nominal damages for trespass. Id., at 49a.
On appeal the Eleventh Circuit affirmed. Riviera Beach v. That Certain Unnamed Gray, Two-Story Vessel Approximately Fifty-Seven Feet in Length, 649 F. 3d 1259 (2011). It agreed with the District Court that the home was a “vessel.” In its view, the home was “capable” of movement over water and the owner’s subjective intent to remain moored “indefinitely” at a dock could not show the contrary. Id., at 1267-1269.
Lozman sought certiorari. In light of uncertainty among the Circuits about application of the term “capable” we granted his petition. Compare De La Rosa v. St. Charles Gaming Co., 474 F. 3d 185, 187 (CA5 2006) (structure is not a “vessel” where “physically,” but only “theoretically],” “capable of sailing,” and owner intends to moor it indefinitely as floating casino), with Board of Comm’rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F. 3d 1299, 1311-1312 (CA11 2008) (structure is a “vessel” where capable of moving over water under tow, “albeit to her detriment,” despite intent to moor indefinitely). See also 649 F. 3d, at 1267 (rejecting views of Circuits that “‘focus on the intent of the shipowner’ ”).
*120 HH
At the outset we consider one threshold matter. The District Court ordered the floating home sold to satisfy the City’s judgment. The City bought the home at public auction and subsequently had it destroyed. And, after the parties filed their merits briefs, we ordered further briefing on the question of mootness in light of the home’s destruction. 567 U. S. 962 (2012). The parties now have pointed out that, prior to the home’s sale, the District Court ordered the City to post a $25,000 bond “to secure Mr. Lozman’s value in the vessel.” 1 Record, Doc. 20, p. 2. The bond ensures that Lozman can obtain monetary relief if he ultimately prevails. We consequently agree with the parties that the case is not moot.
Ill
A
We focus primarily upon the statutory phrase “capable of being used ... as a means of transportation on water.” 1 U. S. C. § 3. The Court of Appeals found that the home was “capable” of transportation because it could float, it could proceed under tow, and its shore connections (power cable, water hose, rope lines) did not “ ‘rende[r]’ ” it “ ‘practically incapable of transportation or movement.’ ” 649 P. 3d, at 1266 (quoting Belle of Orleans, supra, at 1312, in turn quoting Stewart, supra, at 494). At least for argument’s sake we agree with the Court of Appeals about the last-mentioned point, namely, that Lozman’s shore connections did not “ ‘render’ ” the home “ ‘practically incapable of transportation.’ ” But unlike the Eleventh Circuit, we do not find these considerations (even when combined with the home’s other characteristics) sufficient to show that Lozman’s home was a “vessel.”
The Court of Appeals recognized that it had applied the. term “capable” broadly. 649 F. 3d, at 1266. Indeed, it pointed with approval to language in an earlier case, Burks *121 v. American River Transp. Co., 679 F. 2d 69 (1982), in which the Fifth Circuit said:
“ ‘No doubt the three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale.’” 649 F. 3d, at 1269 (quoting Burks, supra, at 75; brackets omitted).
But the Eleventh Circuit’s interpretation is too broad. Not every floating structure is a “vessel.” To state the obvious, a wooden washtub, a plastic dishpan, a swimming platform on pontoons, a large fishing net, a door taken off its hinges, or Pinocchio (when inside the whale) are not “vessels,” even if they are “artificial contrivance[s]” capable of floating, moving under tow, and incidentally carrying even a fair-sized item or two when they do so. Rather, the statute applies to an “artificial contrivance . . . capable of being used ... as a means of transportation on water.” 1 U. S. C. § 3 (emphasis added). “[TJransportation” involves the “conveyance (of things or persons) from one place to another.” 18 Oxford English Dictionary 424 (2d ed. 1989) (OED). Accord, N. Webster, An American Dictionary of the English Language 1406 (C. Goodrich & N. Porter eds. 1873) (“[t]he act of transporting, carrying, or conveying from one place to another”). And we must apply this definition in a “practical,” not a “theoretical,” way. Stewart, 543 U. S., at 496. Consequently, in our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the home’s physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water.
B
Though our criterion is general, the facts of this case illustrate more specifically what we have in mind. But for the fact that it floats, nothing about Lozman’s home suggests that it was designed to any practical degree to transport persons or things over water. It had no rudder or other *122 steering mechanism. 649 F. 3d, at 1269. Its hull was un-raked, ibid., and it had a rectangular bottom 10 inches below the water, Brief for Petitioner 27; App. 37. It had no special capacity to generate or store electricity but could obtain that utility only through ongoing connections with the land. Id., at 40. Its small rooms looked like ordinary nonmaritime living quarters. And those inside those rooms looked out upon the world, not through watertight portholes, but through French doors or ordinary windows. Id., at 44-66.
Although lack of self-propulsion is not dispositive, e. g., The Robert W. Parsons, 191 U. S. 17, 31 (1903), it may be a relevant physical characteristic. And Lozman’s home differs significantly from an ordinary houseboat in that it has no ability to propel itself. Cf. 33 CFR § 173.3 (2012) (“Houseboat means a motorized vessel . . . designed primarily for multi-purpose accommodation spaces with low freeboard and little or no foredeck or cockpit” (emphasis added)). Loz-man’s home was able to travel over water only by being towed. Prior to its arrest, that home’s travel by tow over water took place on only four occasions over a period of seven years. Supra, at 118. And when the home was towed a significant distance in 2006, the towing company had a second boat follow behind to prevent the home from swinging dangerously from side to side. App. 104.
The home has no other feature that might suggest a design to transport over water anything other than its own furnishings and related personal effects. In a word, we can find nothing about the home that could lead a reasonable observer to consider it designed to a practical degree for “transportation on water.”
C
Our view of the statute is consistent with its text, precedent, and relevant purposes. For one thing, the statute’s language, read naturally, lends itself to that interpretation. We concede that the statute uses the word “every,” referring to “every description of watercraft or other artificial contriv- *123 anee.” 1 U. S. C. § 3 (emphasis added). But the term “contrivance” refers to “something contrived for, or employed in contriving to effect a purpose.” 3 OED 850 (def. 7). The term “craft” explains that purpose as “water carriage and transport.” Id., at 1104 (def. V(9)(&)) (defining “craft” as a “vesse[l] . . . for” that purpose). The addition of the word “water” to “craft,” yielding the term “watercraft,” emphasizes the point. And the next few words, “used, or capable of being used, as a means of transportation on water,” drive the point home.
For another thing, the bulk of precedent supports our conclusion. In Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U. S. 19 (1926), the Court held that a wharfboat was not a “vessel.” The wharfboat floated next to a dock; it was used to transfer cargo from ship to dock and ship to ship; and it was connected to the dock with cables, utility lines, and a ramp. Id., at 21. At the same time, it was capable of being towed. And it was towed each winter to a harbor to avoid river ice. Id., at 20-21. The Court reasoned, that, despite the annual movement under tow, the wharfboat “was not used to carry freight from one place to another,” nor did it “encounter perils of navigation to which craft used for transportation are exposed.” Id., at 22. (See Appendix, infra, for photograph of a period wharfboat.)
The Court’s reasoning in Stewart also supports our conclusion. We there considered the application of the statutory definition to a dredge. 543 U. S., at 494. The dredge was “a massive floating platform” from which a suspended clamshell bucket would “removfe] silt from the ocean floor,” depositing it “onto one of two scows” floating alongside the dredge. Id., at 484. Like more traditional “seagoing vessels,” the dredge had, e. g., “a captain and crew, navigational lights, ballast tanks, and a crew dining area.” Ibid. Unlike more ordinary vessels, it could navigate only by “manipulating its anchors and cables” or by being towed. Ibid. Nonetheless *124 it did move. In fact it moved over water “every couple of hours.” Id., at 485.
We held that the dredge was a “vessel.” We wrote that §3’s definition “merely codified the meaning that the term ‘vessel’ had acquired in general maritime law.” Id., at 490. We added that the question of the “watercraft’s use ‘as a means of transportation on water’ is . . . practical,” and not “merely . . . theoretical.” Id., at 496. And we pointed to cases holding that dredges ordinarily “served a waterborne transportation function,” namely, that “in performing their work they carried machinery, equipment, and crew over water.” Id., at 491-492 (citing, e. g., Butler v. Ellis, 45 F. 2d 951, 955 (CA4 1930)).
As the Court of Appeals pointed out, in Stewart we also wrote that §3 “does not require that a watercraft be used 'primarily for that [transportation] purpose,” 543 U. S., at 495; that a “watercraft need not be in motion to qualify as a vessel,” ibid.; and that a structure may qualify as a vessel even if attached—but not “permanently” attached—to the land or ocean floor, id., at 493-494. We did not take these statements, however, as implying a universal set of sufficient conditions for application of the definition. Rather, they say, and they mean, that the statutory definition may (or may not) apply—not that it automatically must apply—where a structure has some other primary purpose, where it is stationary at relevant times, and where it is attached—but not permanently attached—to land.
After all, a washtub is normally not a “vessel” though it does not have water transportation as its primary purpose, it may be stationary much of the time, and it might be attached—but not permanently attached—to land. More to the point, water transportation was not the primary purpose of either Stewart’s dredge or Evansville’s wharfboat; neither structure was “in motion” at relevant times; and both were sometimes attached (though not permanently attached) to the ocean bottom or to land. Nonetheless Stewart’s dredge *125 fell within the statute’s definition while Evansville’s wharf-boat did not.
The basic difference, we believe, is that the dredge was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water while the wharfboat was not designed (to any practical degree) to serve a transportation function and did not do so. Compare Cope v. Vallette Dry Dock Co., 119 U. S. 625 (1887) (floating drydock not a “vessel” because permanently fixed to wharf), with Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U. S. 527, 535 (1995) (barge sometimes attached to river bottom to use as a work platform remains a “vessel” when “at other times it was used for transportation”). See also ibid, (citing Great Lakes Dredge & Dock Co. v. Chicago, 3 F. 3d 225, 229 (CA7 1993) (“[A] craft is a ‘vessel’ if its purpose is to some reasonable degree ‘the transportation of passengers, cargo, or equipment from place to place across navigable waters’”)); Cope, supra, at 630 (describing “hopper-barge” as potentially a “vessel” because it is a “navigable structure^] used for the purpose of transportation”); cf. 1 S. Friedall, Benedict on Admiralty § 164, p. 10-6 (rev. 7th ed. 2012) (maritime jurisdiction proper if “the craft is a navigable structure intended for maritime transportation”).
Lower court cases also tend, on balance, to support our conclusion. See, e. g., Bernard v. Binnings Constr. Co., 741 F. 2d 824, 828, n. 13, 832, n. 25 (CA5 1984) (work punt lacking features objectively indicating a transportation function not a “vessel,” for “our decisions make clear that the mere capacity to float or move across navigable waters does not necessarily make a structure a vessel”); Ruddiman v. A Scow Platform, 38 F. 158 (SDNY 1889) (scow, though “capable of being towed . .. though not without some difficulty, from its clumsy structure” just a floating box, not a “vessel,” because “it was not designed or used for the purpose of navigation,” not engaged “in the transportation of persons or cargo,” and had “no motive power, no rudder, no sails”). See also *126 1 T. Schoenbaum, Admiralty and Maritime Law § 3-6, p. 155 (5th ed. 2011) (courts have found that “floating dry-dock[s],” “floating platforms, barges, or rafts used for construction or repair of piers, docks, bridges, pipelines, and other” similar facilities are not “vessels”); E. Benedict, American Admiralty § 215, p. 116 (rev. 3d ed. 1898) (defining “vessel” as a “ ‘machine adapted to transportation over rivers, seas, and oceans’ ”).
We recognize that some lower court opinions can be read as endorsing the “anything that floats” approach. See Miami River Boat Yard, Inc. v. 60’ Houseboat, 390 F. 2d 596, 597 (CA5 1968) (so-called “houseboat” lacking self-propulsion); Sea Village Marina, LLC v. A 1980 Carlcraft Houseboat, No. 09-3292, 2009 WL 3379923, *5-*6 (D NJ, Oct. 19, 2009) (following Miami River Boat Yard)) Hudson Harbor 79th Street Boat Basin, Inc. v. Sea Casa, 469 F. Supp. 987, 989 (SDNY 1979) (same). Cf. Holmes v. Atlantic Sounding Co., 437 F. 3d 441 (CA5 2006) (floating dormitory); Summerlin v. Massman Constr. Co., 199 F. 2d 715 (CA4 1952) (derrick anchored in the river engaged in building a bridge is a vessel). For the reasons we have stated, we find such an approach inappropriate and inconsistent with our precedents.
Further, our examination of the purposes of major federal maritime statutes reveals little reason to classify floating homes as “vessels.” Admiralty law, for example, provides special attachment procedures lest a vessel avoid liability by sailing away. 46 U. S. C. §§31341-31343 (2006 ed. and Supp. IV). Liability statutes such as the Jones Act recognize that sailors face the special “‘perils of the sea.’” Chandris, Inc. v. Latsis, 515 U. S. 347, 354, 373 (1995) (referring to “ ‘vessels] in navigation’ ”). Certain admiralty tort doctrines can encourage shipowners to engage in port-related commerce. E.g., 46 U. S. C. § 30505; Executive Jet Aviation, Inc. v. Cleveland, 409 U. S. 249, 269-270 (1972). And maritime safety statutes subject vessels to U. S. Coast Guard inspections. E.g., 46 U.S.C. § 3301.
*127 Lozman, however, cannot easily escape liability by sailing away in his home. He faces no special sea dangers. He does not significantly engage in port-related commerce. And the Solicitor General tells us that to adopt a version of the “anything that floats” test would place unnecessary and undesirable inspection burdens upon the Coast Guard. Brief for United States as Amicus Curiae 29, n. 11.
Finally, our conclusion is consistent with state laws in States where floating homeowners have congregated in communities. See Brief for Seattle Floating Homes Association et al. as Amici Curiae 1 (Seattle Brief). A Washington State environmental statute, for example, defines a floating home (for regulatory purposes) as “a single-family dwelling unit constructed on a float, that is moored, anchored, or otherwise secured in waters, and is not a vessel, even though it may be capable of being towed.” Wash. Rev. Code Ann. § 90.58.270(5)(b)(ii) (West Supp. 2012). A California statute defines a floating home (for tax purposes) as “a floating structure” that is “designed and built to be used, or is modified to be used, as a stationary waterborne residential dwelling,” and which (unlike a typical houseboat), has no independent power generation, and is dependent on shore utilities. Cal. Health & Safety Code Ann. § 18075.55(d) (West 2006). These States, we are told, treat structures that meet their “floating home” definitions like ordinary land-based homes rather than like vessels. Seattle Brief 2. Consistency of interpretation of related state and federal laws is a virtue in that it helps to create simplicity making the law easier to understand and to follow for lawyers and for nonlawyers alike. And that consideration here supports our conclusion.
D
The City and supporting amici make several important arguments that warrant our response. First, they argue against use of any purpose-based test lest we introduce into “vessel” determinations a subjective element—namely, the *128 owner’s intent. That element, they say, is often “unverifiable” and too easily manipulated. Its introduction would “foment unpredictability and invite gamesmanship.” Brief for Respondent 33.
We agree with the City about the need to eliminate the consideration of evidence of subjective intent. But we cannot agree that the need requires abandonment of all criteria based on “purpose.” Cf. Stewart, 543 U. S., at 495 (discussing transportation purpose). Indeed, it is difficult, if not impossible, to determine the use of a human “contrivance” without some consideration of human purposes. At the same time, we have sought to avoid subjective elements, such as owner’s intent, by permitting consideration only of objective evidence of a waterborne transportation purpose. That is why we have referred to the views of a reasonable observer. Supra, at 118. And it is why we have looked to the physical attributes and behavior of the structure, as objective manifestations of any relevant purpose, and not to the subjective intent of the owner. Supra, at 121-122. We note that various admiralty treatises refer to the use of purpose-based tests without any suggestion that administration of those tests has introduced too much subjectivity into the vessel-determination process. 1 Friedall, Benedict on Admiralty § 164; 1 Schoenbaum, Admiralty and Maritime Law § 3-6.
Second, the City, with support of amici, argues against the use of criteria that are too abstract, complex, or open-ended. Brief for Respondent 28-29. A court’s jurisdiction, e. g., admiralty jurisdiction, may turn .on application of the term “vessel.” And jurisdictional tests, often applied at the outset of a case, should be “as simple as possible.” Hertz Corp. v. Friend, 559 U. S. 77, 80 (2010).
We agree with the last-mentioned sentiment. And we also understand that our approach is neither perfectly precise nor always determinative. Satisfaction of a design-based or purpose-related criterion, for example, is not always *129 sufficient for application of the statutory word “vessel.” A craft whose physical characteristics and activities objectively evidence a waterborne transportation purpose or function may still be rendered a nonvessel by later physical alterations. For example, an owner might take a structure that is otherwise a vessel (even the Queen Mary) and connect it permanently to the land for use, say, as a hotel. See Stewart, supra, at 493-494. Further, changes over time may produce a new form, i.e., a newly designed structure—in which case it may be the new design that is relevant. See Kathriner v. Unisea, Inc., 975 F. 2d 657, 660 (CA9 1992) (floating processing plant was no longer a vessel where a “large opening [had been] cut into her hull”).
Nor is satisfaction of the criterion always a necessary condition, see Part IV, infra. It is conceivable that an owner might actually use a floating structure not designed to any practical degree for transportation as, say, a ferry boat, regularly transporting goods and persons over water.
Nonetheless, we believe the criterion we have used, taken together with our example of its application here, should offer guidance in a significant number of borderline cases where “capacity” to transport over water is in doubt. Moreover, borderline cases will always exist; they require a method for resolution; we believe the method we have used is workable; and, unlike, say, an “anything that floats” test, it is consistent with statutory text, purpose, and precedent. Nor do we believe that the dissent's approach would prove any more workable. For example, the dissent suggests a relevant distinction between an owner’s “clothes and personal effects” and “large appliances (like an oven or a refrigerator).” Post, at 140 (opinion of Sotomayor, J.). But a transportation function need not turn on the size of the items in question, and we believe the line between items being transported from place to place (e. g., cargo) and items that are mere appurtenances is the one more likely to be relevant. Cf. Benedict, American Admiralty §222, at 121 (“A ship is *130 usually described as consisting of the ship, her tackle, apparel, and furniture
Finally, the dissent and the Solicitor General (as amicus for Lozman) argue that a remand is warranted for further factfinding. See post, at 143-144; Brief for United States as Amicus Curiae 29-31. But neither the City nor Lozman makes such a request. Brief for Respondent 18, 49, 52. And the only potentially relevant factual dispute the dissent points to is that the home suffered serious damage during a tow. Post, at 143. But this would add support to our ultimate conclusion that this floating home was not a vessel. We consequently see nothing to be gained by a remand.
IV
Although we have focused on the phrase “capable of being used” for transportation over water, the statute also includes as a “vessel” a structure that is actually “used” for that transportation. 1 U. S. C. § 3 (emphasis added). And the City argues that, irrespective of its design, Lozman's floating home was actually so used. Brief for Respondent 32. We are not persuaded by its argument.
We are willing to assume for argument’s sake that sometimes it is possible actually to use for water transportation a structure that is in no practical way designed for that purpose. See supra, at 129. But even so, the City cannot show the actual use for which it argues. Lozman’s floating home moved only under tow. Before its arrest, it moved significant distances only twice in seven years. And when it moved, it carried, not passengers or cargo, but at the very most (giving the benefit of any factual ambiguity to the City) only its own furnishings, its owner’s personal effects, and personnel present to ensure the home’s safety. 649 F. 3d, at 1268; Brief for Respondent 32; Tr. of Oral Arg. 37-38. This is far too little actual “use” to bring the floating home within the terms of the statute. See Evansville, 271 U. S., at 20-21 (wharfboat not a “vessel” even though “[e]ach winter” it *131 “was towed to [a] harbor to protect it from ice”); see also Roper v. United States, 368 U. S. 20, 23 (1961) (“Unlike a barge, the S. S. Harry Lane was not moved in order to transport commodities from one location to another”). See also supra, at 122-127.
V
For these reasons, the judgment of the Court of Appeals is reversed.

It is so ordered.

[Appendix to opinion of the Court begins on p. 132.]
*132 APPENDIX
[[Image here]]
Petitioner’s floating home. App. 69.
*133 [[Image here]]
50- by 200-foot wharfboat in Evansville,. Indiana, on Nov. 13, 1918. H. R. Doe. No. 1521, 65th Cong., 3d Sess., Illustration No. 13 (1918).