# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-868 consolidated with 18-915

DON CALDWELL, INDIVIDUALLY,
AND SHERONDA CALDWELL, INDIVIDUALLY

VERSUS

ST. CHARLES GAMING COMPANY

D/B/A ISLE OF CAPRI CASINO-LAKE
CHARLES

**********

SUPERVISORY WRITS FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2016-1333
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of Ulysses G. Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, Elizabeth A. Pickett, Billy H. Ezell, Shannon J. Gremillion, Phyllis M. Keaty, John E. Conery, D. Kent Savoie, Van H. Kyzar, Candyce G. Perret, and Jonthan W. Perry, Judges.

WRIT DENIED.
WRIT GRANTED AND MADE PEREMPTORY.

Pickett, J., dissents and assigns written reasons.
Gremillion, J., dissents for the reasons assigned by Judge Pickett.
Kyzar, J., concurs with additional reasons.
Perry, J., concurs for the reasons assigned by Kyzar, J.

**Kevin L. Camel**
**Cox, Cox, Filo, Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFFS/RESPONDENTS:**
 **Don Caldwell**
 **Sheronda Caldwell**

**Evans Martin McLeod**
**David I. Clay, II**
**Phelps Dunbar, LLP**
**365 Canal Street, Suite 2000**
**New Orleans, LA 70130-6534**
**(504) 566-1311**
**COUNSEL FOR DEFENDANT/APPLICANT:**
 **Grand Palais Riverboat, LLC**

**SAUNDERS, Judge.**

**18-868**

The defendant-relator, St. Charles Gaming Company, Inc., d/b/a Isle of Capri Casino Lake Charles, seeks supervisory writs from the judgment of the Fourteenth Judicial District Court, the Honorable Sharon Darville Wilson presiding, which denied its motion for summary judgment.

**18-915**

The plaintiffs-relators, Don Caldwell and Sheronda Caldwell, seek supervisory writs from the judgment of the Fourteenth Judicial District Court, the Honorable Sharon Darville Wilson presiding, which denied their cross motion for summary judgment.

## STATEMENT OF THE CASE

The instant case arises for injuries allegedly sustained by plaintiff, Don Caldwell, while operating a scissor lift on a riverboat casino, the Grand Palais Casino (Grand Palais), moored in Lake Charles, on April 9, 2015. Don and his wife, Sheronda Caldwell (Plaintiffs), filed suit against his employer, St. Charles Gaming Company, L.L.C. (Defendant), under the Jones Act. The Defendant filed a motion for summary judgment on October 27, 2017, on the basis that Don was not a Jones Act seaman at the time of the incident, because he had no connection to a vessel in navigation that was substantial in nature and was never exposed to the perils of the sea. Likewise, the Plaintiffs filed a cross motion for summary judgment on the basis that the Grand Palais was a vessel at the time of the incident for the purposes of their Jones Act claim. Both motions were denied by the trial court following a hearing on September 17, 2018. The parties are now before this court on writs seeking review of the trial court's rulings.

## SUPERVISORY RELIEF

The requirement of irreparable injury is met in this case in light of *Herlitz Construction Company, Inc. v. Hotel Investors of New Iberia, Inc.*, 396 So.2d 878 (La.1981). When the overruling of an exception is arguably incorrect, when a reversal will terminate the litigation, and when there is no dispute of fact to be resolved, judicial efficiency and fundamental fairness to the litigants dictate that the merits of the application for supervisory writs should be decided in an attempt to avoid the waste of time and expense of a possibly useless future trial on the merits.

## ON THE MERITS

**18-868**

The defendant argues that the trial court failed to follow this court's controlling precedent in *Benoit v. St. Charles Gaming Company, Inc.*, 17-101 (La.App. 3 Cir. 11/8/17), 230 So.3d 997, *writ denied*, 17-2051 (La. 2/2/18), 233 So.3d 615, *cert. denied*, ___ U.S. ___, 139 S.Ct. 104 (2018). Benoit was allegedly injured while working as a deck hand on the Grand Palais Casino moored in Lake Charles on August 28, 2013. He and his wife filed suit against St. Charles Gaming Company, Inc., under the Jones Act. St. Charles moved for summary judgment, asserting that the Grand Palais was not a vessel under general maritime law. The Plaintiffs filed a cross motion for summary judgment on the same issue. The trial court found that the Grand Palais was a vessel, granted summary judgment in favor of the Plaintiffs and denied St. Charles' motion.

On appeal, this court found that the Grand Palais was not a vessel under general maritime law:

> The Grand Palais' primary purpose is dockside gambling. For more than sixteen years, it has not engaged in any maritime activity and has been moored at the same location with all operations required for its gaming activities operated via land-based services. It is possible the Grand Palais could be returned to service as a vessel; however, the

2

evidence establishes that for more than sixteen years, it has been indefinitely moored to provide for and maintain its primary purpose of riverboat gaming. Thus, although the Grand Palais was originally designed to transport people over water, we find that as a result of the changes to its physical characteristics, its purpose, and its actual function over the past sixteen years, it is no longer a vessel.

In reaching this conclusion, we are cognizant that a vessel "and its crew do not move in and out of Jones Act coverage" based on the vessel's activities at any given moment. *Stewart* [*v. Dutra Const. Co.*], 543 U.S. 481, 125 S.Ct. 1118 [(2005)]. The change in the Grand Palais' purpose and function, however, has exceeded sixteen years. Importantly, due to these changes, Mr. Benoit has not been subjected to "the special hazards and disadvantages" the Jones Act was enacted to remedy. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104, 66 S.Ct. 872, 882, 90 L.Ed. 1099 (1946).

To qualify as a Jones Act seaman, Mr. Benoit must prove that he works on a vessel. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). Our determination that the Grand Palais is not a vessel precludes proof of this requirement.

*Id*. at 1001.

Judge Amy issued a concurring opinion, wherein he added:

I agree with the majority that application of the analysis required in *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 133 S.Ct. 735, 184 L.Ed.2d 604 (2013) indicates that this riverboat is not a "vessel" for purposes of 1 U.S.C. § 3. Observing that Section 3 defines a "vessel" as "an 'artificial contrivance . . . capable of being used . . . as a means of transportation on water[,]'" the Supreme Court explained that "a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id*. at 121, 133 S.Ct. 735.

As explained in the majority review, this riverboat undoubtedly includes many of the physical characteristics and activities of a vessel as described in *Lozman*. It has a crew, the capacity of self-propulsion, and it features a steering mechanism. Yet, those physical characteristics must be viewed alongside the fact that this riverboat has not been engaged in the physical activities of transport since it became moored for operation as a dockside gaming facility in 2001. Given that obvious and consistent mooring, as well as the fact that patrons enter the riverboat from the land-based pavilion by an entranceway described by the Engineer as approximately "40-by-40," I find that the reasonable observer would view the remaining physical characteristics as mere artifacts creating the superficial façade of a means of transport.

*Id*. at 1002 (alteration in original).

This writer dissented, finding that the riverboat was a vessel. I reasoned that the riverboat was designed for navigation, was capable of navigation, and had been used in navigation. "Frequency of navigation is simply not part of the equation." *Id.* at 1002.

Likewise, in the instant case, the defendant concludes that in light of *Benoit*, this court should conclude that the Grand Palais was not a vessel at the time of the incident; thus, the Plaintiffs' claims do not fall under the Jones Act.

**18-915**

The undisputed facts, the Plaintiffs argue, reflect that the Grand Palais has not been removed from navigation, laid up, or mothballed. The Plaintiffs urge that the defendant spends considerable time and expense to ensure that the vessel remains capable of operating as required of all riverboat casinos in Louisiana. La.R.S. 27:44.[1] The witnesses, the Plaintiffs add, agree that the condition of the Grand Palais has not materially changed since it ceased daily excursions in 2001, and that it was capable of navigation at the time Don was injured, April 9, 2015. The Grand Palais, connected to the dock by temporary connections and gangways designed to be lifted and retracted, could be made ready to sail in thirty minutes.

---

[1] A riverboat was defined in La.R.S. 27:44, at the time of the accident as:

(23) "Riverboat" means a vessel which:
(a) Carries a valid Certificate of Inspection issued by the United States Coast Guard with regard to the carriage of passengers on designated rivers or waterways within or contiguous to the boundaries of the state of Louisiana.
(b) Carries a valid Certificate of Inspection from the United States Coast Guard for the carriage of a minimum of six hundred passengers and crew.
(c) Has a minimum length of one hundred fifty feet.
(d) Is of such type and design so as to replicate as nearly as practicable historic Louisiana river borne steamboat passenger vessels of the nineteenth century era. It shall not, however, be a requirement that the vessel be steam-propelled or maintain overnight facilities for its passengers.
(e) Is paddlewheel driven.

With regard to the ruling in *Benoit*, the Plaintiffs maintain that this court's finding that the vessel had been indefinitely moored is not the standard established in *Stewart*, 543 U.S. 481, 125 S.Ct. 1118 (2005). In *Stewart*, the defendant dug a trench beneath the Boston Harbor using its dredge, a floating platform with a bucket that removed silt from the ocean floor. The dredge had limited means of self-propulsion but was capable of navigating short distances by manipulating its anchors and cables. During the dredging process, the dredge typically moved once every couple of hours. The plaintiff was injured while repairing the dredge and subsequently sued the defendant under the Jones Act and an alternative claim under the Longshore and Harbor's Workers' Compensation Act (LHWCA). The defendant's motion for summary judgment on the basis that the dredge was not a vessel was granted by the District Court and affirmed by the First Circuit. The matter was then remanded to the District Court on the LHWCA claim. In affirming the ruling, the First Circuit noted that the defendant conceded that the dredge was a vessel under the Jones Act. The court found, however, that the defendant's alleged negligence was committed in its capacity as an employer, not as the owner of the vessel. The Supreme Court granted certiorari to resolve the confusion over the determination of whether a watercraft is a vessel for the purposes of the LHWCA.

The Supreme Court noted, first, that the term "vessel" was not defined in the LHWCA; thus, the Court looked to the definition of "vessel" in Rules of Construction Act, 1 U.S.C. § 3 "[t]he word 'vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." Also, the Court noted that dredges served as waterborne transportation since they carried machinery, equipment, and crew over water. The Court rejected the argument that the dredge was not a vessel because its primary purpose was not navigation or commerce and because it was not in actual transit at

the time of the plaintiff's injury. "Neither prong of the Court of Appeals' test is consistent with the text of § 3 or the established meaning of the term 'vessel' in general maritime law."[2] 543 U.S. at 495.

The Court concluded:

[T]he "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation. A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one. In some cases that inquiry may involve factual issues for the jury, but here no relevant facts were in dispute. Dutra conceded that the *Super Scoop* was only temporarily stationary while Stewart and others were repairing the scow; the *Super Scoop* had not been taken out of service, permanently anchored, or otherwise rendered practically incapable of maritime transport.

543 U.S. at 496 (citations omitted).

The Plaintiffs also refer to *Breaux v. St. Charles Gaming Co.*, 10-1349, 11-128 (La.App. 3 Cir. 6/22/11), 68 So.3d 684, *writ denied*, 11-1661 (La. 10/7/11), 71 So.3d 322, wherein a patron was injured on a floating casino, the M/V Crown, permanently moored to a dock at the Isle of Capri Casino. The patron filed suit under general maritime law. Summary judgment was granted in favor of the patron on the issue of maritime jurisdiction, and the casino's cross motion for summary judgment on the same issue was denied.

On appeal, this court found pertinent the following facts:

The record before us shows that the M/V Crown was originally placed into service in Lake Charles as a functioning gambling boat that would cruise the Calcasieu River and Lake Charles while providing gaming activities for its passengers. In 2001, the Louisiana legislature amended the gambling laws so as to prohibit gambling boats in Lake Charles from conducting cruises or excursions. In accordance with La.R.S. 27:65, since March 27, 2001, the M/V Crown has been docked and its licensee, St. Charles Gaming, has not conducted any cruises.

---

[2]To qualify as a vessel, the watercraft must be "used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3

6

> The M/V Crown was fitted with four winches, each holding steel cables to permanently secure the vessel to the dock. Utilities including electricity, water, telephone, sewer, cable television, surveillance, and data processing lines were attached to the vessel from land-based sources. Since the law was changed, the crew has been significantly reduced, and the captain is no longer responsible for any navigational duties. The M/V Crown has not been licensed by the Coast Guard since 2001. Nevertheless, the vessel still contains the equipment necessary for navigation and theoretically could sail again in the future if brought back into compliance with Coast Guard regulations.

*Id*. at 685-86.

This court concluded that the M/V Crown did not qualify as a vessel in navigation for purpose of invoking federal admiralty jurisdiction. This court reasoned:

> Breaux was injured while on a gaming boat permanently attached to the shore, not used in navigation, and not performing any traditional maritime activity. Federal jurisprudence previously cited herein has interpreted maritime jurisdictional rules and definitions as they pertain to similar casinos, finding such casinos to be outside the definition of a "vessel in navigation." We choose to follow that jurisprudence. As this court stated in *Gaspard v. Transworld Drilling Co.*, 468 So.2d 692, 695 (La.App. 3 Cir.1985), "uniformity of general maritime law is best served by following the rule established by our federal brethren."

*Id*. at 687.

This writer issued a dissenting opinion which was joined by Chief Judge Thibodeaux. It stated, as follows:

> I disagree with the majority opinion in both its methodology and result regarding whether the M/V Crown is a "vessel" for purposes of federal admiralty jurisdiction, and whether federal admiralty jurisdiction is proper. Regarding methodology and whether the M/V Crown is a "vessel," the majority opinion seems to draw a bright-line rule that since our legislature enacted La.R.S. 27:65 "Louisiana's permanently moored casinos are not vessels in navigation for purposes of maritime jurisdiction." Such a bright-line rule does not follow the methodology that is mandated by the United States Supreme Court in *Stewart v. Dutra Construction Company*, 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005).
>
> The *Stewart* court, as courts have done since nearly the dawn of this issue, looked to 1 U.S.C.A. § 3 to determine if a watercraft is a "vessel." "The word 'vessel' includes *every* description of watercraft or other artificial contrivance used, or *capable of being used*, as a means

of transportation on water." 1 U.S.C.A. § 3 (emphasis added). The majority opinion fails to specifically address whether the M/V Crown fits within the language of 1 U.S.C.A. § 3. Instead, it cites *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5th Cir.2006) as support for its conclusion that the M/V Crown is not a "vessel" for purposes of federal admiralty jurisdiction. It is true that in *De La Rosa* the United States Fifth Circuit found that the M/V Crown was not a "vessel" in navigation for purposes of maritime jurisdiction. However, Breaux contends that the record available to the *De La Rosa* court was insufficient and explains that this insufficiency is why the United States Fifth Circuit reached its conclusion. Our court is not privy to the record available to the *De La Rosa* court. An appellate court decides its cases on the record before it. See La.Code Civ.P. art. 2164. I feel that this court should focus on the record before it and make a proper analysis of whether the M/V Crown is a "vessel" under 1 U.S.C.A. § 3 rather than create a hard and fast rule that federal admiralty jurisdiction does not apply to all permanently moored watercraft casinos in Louisiana.

*Id*. at 687-688.

Lastly, the Plaintiffs cite *Lemelle v. St. Charles Gaming Co., Inc.*, 11-255 (La.App. 3 Cir. 1/4/12), 118 So.3d 1, *writ denied*, 12-339 (La. 4/27/12), 86 So.3d 627, *cert. granted, judgment vacated*, 568 U.S. 1141, 133 S.Ct. 979 (2013), wherein a patron was injured on a riverboat casino that had been moored dockside since 2001. The patron sought damages under general maritime laws. The defendant filed an exception of no cause of action and/or motion for summary judgment, asserting that the riverboat casino was not a vessel for maritime purposes. The patron filed a cross motion for summary judgment, seeking a declaration that the riverboat casino was a vessel for the purposes of a maritime claim. The trial court granted the patron's motion, finding the riverboat casino to be a vessel. On appeal, the lower court was reversed; Judge Thibodeaux issued a dissenting opinion. The Supreme Court granted certiorari, vacated the judgment, and remanded the case to this court for further consideration in light of *Lozman v. Riviera Beach,* 568 U.S. 115, 133 S.Ct.

8

735 (2013).[3][4] The Plaintiffs herein conclude that the Supreme Court vindicated Judge Thibodeaux's well-reasoned dissent.

In his dissent, Judge Thibodeaux addressed admiralty jurisdiction in tort cases under 28 U.S.C. § 1333(1). Judge Thibodeaux's first inquiry was whether the riverboat casino was a vessel:

> The primary and binding legal authority for this court is 1 U.S.C. § 3. To be a vessel, the statute requires merely that a watercraft be capable of being used as a means of transportation on water. It is the jurisprudence, a secondary and non-binding authority in this state, which added considerations of practicality to the statutory test. Among these secondary authorities, the Supreme Court's guidance is certainly more persuasive than that of the Fifth Circuit. As dictated by the Supreme Court in *Stewart*, our focus should be on whether Crown has been "rendered practically *incapable* of transportation or movement." [*Stewart*,] 543 U.S. at 494, 125 S.Ct. at 1127 (emphasis added). While I agree with the Fifth Circuit that Crown's *use* as a means of transportation over water may be theoretical, I conclude that Crown's *capability* of use as a means of transportation over water at the time of the accident was a practical one.
>
> As the Eleventh Circuit correctly observed, a boat does not enter and leave admiralty jurisdiction on the basis of state law or the individual thoughts of the boat owner. [*Bd. of Comm'rs of the Orleans Levee Dist. v.*] *M/V Belle of Orleans*, 535 F.3d 1299 [(11ᵗʰ Cir. 2008)]. This is why that Crown has been attached to the dock since 2001 is of limited, if any, consequence. If St. Charles decides to sell Crown and move it somewhere, which it is in the process of doing at this very time, there would be no dispute that Crown would become a vessel immediately. Or, if Crown were to move with its crew to avoid a hurricane, for example, would there be any question regarding its status as a vessel if a member of its crew injured himself? Certainly, the question of whether something is or is not a vessel cannot depend on the subjective whim of the owner. Moreover, as the Eleventh Circuit also pointed out, a ship does not become a non-vessel if its Coast Guard certification expires. *Id*. For the same reason, that Crown may only conduct gambling dockside under the Louisiana statute has little bearing, if any, on whether it is a vessel.
>
> Finally, I am aware of this court's recent decision in *Breaux v. St. Charles Gaming Company, Inc.*, 10-1349, 11-128 (La.App. 3 Cir. 6/22/11),

---

[3] In *Lozman*, the Supreme Court held that a structure does not qualify as a vessel unless a reasonable observer, based on the structure's physical characteristics and activities, would consider it designed for carrying people or things over water. The *Lozman* Court concluded that a floating home with no rudder or steering mechanism, with an unraked hull, and which was incapable of self-propulsion was not a vessel.

[4] On remand, the matter settled and was dismissed before this court had the opportunity to consider it.

9

68 So.3d 684. *Breaux* relied heavily on the Fifth Circuit's decision in *De La Rosa*[,] 474 F.3d 185. As explained above, the *De La Rosa* court applied an incorrect test to determine whether a watercraft is a vessel. Thus, Justice Dennis's sentiments are especially germane: "if a judge ignores a clearly applicable Code rule and follows another jurisdiction's case, his example of using the wrong starting point or source of law should not be influential at all." James L. Dennis, *Interpretation & Application of the Civil Code & the Evaluation of Judicial Precedent*, 54 LA. L.REV. 1, 15 (1993). I also note with approval and adopt Judge Saunders's reasoning he so brilliantly articulated in his dissent in which I joined.

Moreover, the record in *Breaux* regarding the facts indicating that Crown is a vessel was not nearly as developed as it is in this case. This may have contributed to the conclusion in that case. Finally, as pointed out previously, Louisiana is a state where jurisprudence has no binding authority on the court. Thus, our main inquiry should be whether Crown is "*capable* of being used . . . as a means of transportation on water." 1 U.S.C. § 3. (Emphasis supplied).

The maintenance of a captain and a crew, the constant maintenance of navigational tools and equipment, the regular operation of the engines, all point to Crown's practical capability of being used as a means of transportation over water. It is true that Crown is attached by various cables to land. Nevertheless, according to Crown's captain, all of these attachments to land can be removed, and Crown can be ready to sail in less than one hour. Thus, neither Crown's inherent characteristics nor external barriers (such as those that would exist if, for example, Crown were placed in dry dock) impede Crown's practical capability of being used as a means of transportation over water. Based on these considerations, I find no error in the trial court's conclusion that Crown is a vessel. The majority errs when it concludes otherwise.

*Id.* at 8-9.

The Plaintiffs conclude that according to the U.S. Supreme Court, a watercraft that is capable of transportation, but has been docked indefinitely and not removed from navigation, is a vessel in navigation for the purposes of maritime law. *Stewart*, 543 U.S. 481; *Lozman*, 568 U.S. 115. Further, the Plaintiffs urge that a vessel must be permanently disabled to be deemed removed from navigation and no longer be considered a vessel. The defendant does not dispute that the Grand Palais was a vessel prior to August 2001. Therefore, the Plaintiffs contend that it remains a vessel until it is removed from navigation. At the time of the accident, the Grand Palais had not been disabled, removed from the water, or sunk to the bottom of the lake,

enclosed in a cofferdam.  The Plaintiffs add that the defendant works diligently to maintain the Grand Palais in a fully-operational condition as required by law.

**CONCLUSION**

This court finds the U.S. Supreme Court's decisions in *Stewart*, 543 U.S. 481, and *Lozman*, 568 U.S. 115, to be controlling.  As such, we find that the Grand Palais was a vessel at the time of the incident; thus, the trial court should have granted the Plaintiffs' motion for summary judgment.  Accordingly, the Plaintiffs' writ is granted, and the defendant's writ is denied.

**18-868**

**WRIT DENIED.**  We find no error in the trial court's ruling.

**18-915**

**WRIT GRANTED AND MADE PEREMPTORY.**  In keeping with the decisions of the United States Supreme Court in *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 125 S.Ct. 1118 (2005), and *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 133 S.Ct. 735 (2013), we find that the Grand Palais Casino was a vessel at the time of the alleged accident.  Accordingly, we reverse and set aside the trial court's ruling denying the motion for summary judgment filed by the plaintiffs, Don and Sheronda Caldwell, as to the issue of seaman status, and we hereby enter judgment granting summary judgment finding that plaintiff, Don Caldwell, was a seaman at the time of his accident on April 9, 2015.  This matter is remanded to the trial court for further proceedings in accordance with this court's ruling herein.

11

# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-868 consolidated with 18-915

DON CALDWELL, INDIVIDUALLY AND
SHERONDA CALDWELL, INDIVIDUALLY

VERSUS

ST. CHARLES GAMING COMPANY
D/B/A ISLE OF CAPRI – LAKE CHARLES

**Pickett, J., dissents and assigns written reasons.**

For the reasons set forth in *Benoit v. St. Charles Gaming Co., Inc.*, 17-101 (La.App. 3 Cir. 11/8/17), 230 So.3d 997, *writ denied*, 17-2051 (La. 2/2/18), 233 So.3d 615, I still conclude that this is <u>not</u> a <u>vessel</u> for purposes of maritime law. I respectfully dissent.

DON CALDWELL, INDIVIDUALLY

AND SHERONDA CALDWELL, INDIVIDUALLY

VERSUS

ST. CHARLES GAMING COMPANY

D/B/A ISLE OF CAPRI CASINO – LAKE

CHARLES

**Kyzar, J., concurring with additional reasons.**

By 1991 Louisiana Acts No. 753, § 1, the Louisiana Legislature enacted the Louisiana Riverboat Economic Development and Gaming Control Act, La.R.S. 4:501-62, often referred to as the Riverboat Gaming Act. This comprehensive legislative scheme, originally set out in twelve parts, provided a licensing process for riverboat operators seeking to conduct gaming activities on riverboats in Louisiana and a regulatory scheme for such gaming. *State Through Dep't of Pub. Safety & Corrs. v. La. Riverboat Gaming Comm'n & Horseshoe Entm't*, 94-1872 (La. 5/22/95), 655 So.2d 292. The act authorized the licensing and operation of fifteen riverboat casinos and created two separate bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities in furtherance of the act's purposes. *Astoria Entm't, Inc. v. DeBartolo*, 08-1690 (La. 5/22/09), 12 So.3d 956. This act was superseded in part in 1996, by the Louisiana Gaming Control Law, La.R.S. 27:1-501. The portions of the prior law that were not revoked are now found at La.R.S. 27:41-113.

Louisiana Revised Statutes 27:44 answers the question before us. It specifically provides the definition of a riverboat authorized to conduct gaming in this state as follows:

> (24) "Riverboat" means a vessel or facility which:
>
> (a) Carries a valid Certificate of Inspection issued by the United States Coast Guard with regard to the **carriage of passengers on designated rivers or waterways within or contiguous to the boundaries of the state of Louisiana**.
>
> (b) Carries a valid Certificate of Inspection from the United States Coast Guard **for the carriage of a minimum of six hundred passengers and crew**.
>
> (c) Has a minimum length of one hundred fifty feet.
>
> (d) Is of such type and design so as to replicate as nearly as practicable historic Louisiana river borne steamboat passenger vessels of the nineteenth century era. It shall not, however, be a requirement that the vessel be:
>
> > (i) Steam-propelled or maintain overnight facilities for its passengers.
> >
> > (ii) Paddlewheel-driven or have an operable paddlewheel.

(Emphasis added.)

The United States Coast Guard issues valid Certificates of Inspection for ships, boats, and watercraft that meet certain specifications. 46 C.F.R § 2.01-5. It does not license or issue certifications for hotels, buildings, casinos, or other such structures. "The Coast Guard, generally, has jurisdiction over the operations of vessels and the conduct of the crew." *Watterson v. Mallard Bay Drilling, Inc.*, 93-1494, p. 7 (La.App. 3 Cir. 10/12/94), 649 So.2d 431, 435, *writ denied*, 94-2769 (La. 1/27/95), 650 So.2d 241. Our legislature, in its infinite wisdom, chose to allow gambling on "riverboats" as opposed to land-based casinos. The origin of this artifice has been well studied and written about and is now permanently engrained

2

in the lore of this state. Some have even been imprisoned as a result of the efforts that resulted in riverboat gambling in Louisiana. A "riverboat," as defined in our law, and through the Coast Guard certification process, is a vessel, which pursuant to 1 U.S.C.A. § 3, is a "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."

One land based casino has now been authorized by the legislature, that being in New Orleans. All other casinos operating legally within the state, other than tribal casinos which are not under the state's jurisdiction, operate via authority of La.R.S. 27:41-113. Thus, if they are not, in fact, vessels capable of navigation upon water, they are in violation of law and are operating illegally. It is extremely obvious given this record that St. Charles Gaming Company, Inc. works very hard to keep the Grand Palais in compliance with La.R.S. 27:44 as a working riverboat so as to maintain its license to operate as a casino. The operators cannot have it both ways, to be a vessel for casino-licensing purposes but not a vessel for all other legal purposes, at least not applying the plain wording of the law as it currently exists.

It is not for us to legislate, but to apply the law as written and to interpret the law only when necessary. If the legislature decides to end the pretense of the present state of riverboat gaming and allow for true dockside gambling, it has the power to do so with the stroke of the legislative pen.

3